Booth, J.,
delivered the opinion of the court:
This case comes to the court under a special jurisdictional act approved February 15, 1909 (35 Stat. L., 619), as set forth in Finding I.
The claim is predicated upon certain rights alleged to have accrued to the claimant Indians under the provisions of treaties executed in 1855, 1863, and 1864, having to do with the disposition of their landed interests, upon which they have resided since time immemorial. The claimants herein are a band of that formerly large and powerful tribe of Ojibwa (now known as Chippewa) Indians, the largest and most important tribe of the Algonquian stock, who inhabited a most extensive territory about the upper Great Lakes in Michigan, Minnesota, Ontario, Manitoba, and adjacent regions, extending westward to Turtle Mountains in Dakota. On February 22, 1855, the United States, through its proper officials, entered into a treaty with the Mississippi Bands of the Chippewas, by the terms of which they ceded to the Government all their right, title, and interest owned or claimed by them to lands embraced within the Territory of Minnesota. In consideration for the cession the six bands known as Mississippi Chippewas received a specific reservation set apart out of the lands so ceded upon which they were to permanently reside. The portion set aside to the Mille Lacs, the claimants herein, embraced four townships bordering on Mille Lacs Lake and three small islands in the lake. The United States agreed to pay certain sums in annuities for 20 *450 years, and to expend various other sums in improving the reservations, making them habitable, and otherwise generously providing for the general welfare of the Indians. (10 Stat. L., 1165.)
On March 11, 1863, another treaty was entered into between the same parties at Washington, X). C. The treaty of 1863 (12 Stat. L., 1249) provided for the cession to the United States of the reservations provided for the Indians . in the treaty of 1855; provided them with another reservation set apart by particular description; extended the present annuities for 10years; appropriated $20,000 to pay for depredations committed in 1862; appropriated $16,000 to pay the chiefs of the bands; agreed to pay the expenses of the State of Minnesota incurred in September, 1862, for sending commissioners to visit the Indians, to the extent of $1,338.15; expressly agreed to clear, stump, grub, and plow certain lands on the reservation for each of the bands; to build houses for the chiefs; to furnish oxen, log chains, plows, and other agricultural implements; establish and maintain a sawmill; and •otherwise improve and render susceptible to cultivation and habitation their new reservation, to which they were expected to immediately remove.
j Article 12 of the treaty — the gravamen of this complaint, upon the construction of which the decision herein rests— provided as follows:
“ It shall not be obligatory upon the Indians, parties to this treaty, to remove from their present reservations until the United States shall have first complied with the stipulations of articles 4 and 6 of this treaty, when the United States sb all furnish them with all necessary transportation and subsistence to their new homes and subsistence for six months thereafter: Provided, That owing to the heretofore good conduct of the Mille Lac Indians they shall not be compelled to remove so long as they shall not in any way interfere with or in any manner molest the persons or property of the whites.”
On May 7, 1864, another treaty was entered into between the same parties concerning the same subject. (13 Stat. L., 693.) The annuities were again extended, and certain allotments in fee out of their respective reservations were made to their réspective chiefs. Substantially the same provisions for the cultivation and improvement of their new habitat *451 were incorporated therein, although the amounts therefor were increased ($25,000 was appropriated for agency buildings) and article 12 of the treaty of 1863, supra, was repeated verbatim as article 12 of the treaty of 1864.
In April, 1811, filings for homesteads and preemption entries were made under the public-land laws, principally in soldiers’ additional scrip, upon the lands of the Mille Lac Indian Reservation. Up to March 31, 1884, 55,976.42 acres of the total acreage of 61,028.14 had been filed upon as open to settlement. On June 20, 1871, the Interior Department ordered the suspension of all entries alleged to have been made under the treaties of 1854 and 1855 and notified the parties that the same would be canceled, and on September 23,1871, all entries made up to that date were canceled. Subsequently, -on March 1, 1877, the Hon. Z. Chandler, then Secretary of the Interior, reversed the preceding decision as to cancellation of above entries, but suspended the execution of his decision and directed the discontinuance of the filing of entries until the close of the next Congress, holding all existing claims in statu quo. In 1878 Hon. Carl Schurz, then Secretary of the Interior, reversed the decision of his predecessor and directed the local land office to discontinue filings upon the lands embraced within claimants’ reservation. Notwithstanding the express inhibitions contained in the two decisions of the. Secretary of the Interior, the officers of the local land office, who were the same incumbents of the offices of register and receiver when the decisions were announced, continued the receipt of entries until, in March, 1879, they had allowed soldiers’ additional homestead entries upon the Mille Lac Indian Reservation to the extent of 23,913.46 acres of land. Secretary Schurz promptly canceled all the entries made in contravention of his express orders, designed as they had been to withhold from public settlement this particular Indian reservation until the rights of the Mille Lac Indians therein could be ascertained.
On May 10¡ 1882, Hon. Henry M. Teller, Secretary of the Interior, reviewed at length the legal status of the disputed entries upon the Mille Lac Reservation, and decided that a sufficient acreage of the Mille Lac Reservation necessary to maintain and support the diminished band should be set aside *452 for them, and the surplus lands after said ascertainment should be open to settlement as part of the public domain.
In 1884 the Congress passed the act of July 4, 1884 (23 Stat. L., 76, 98), providing that none of the aforesaid lands should be patented or disposed of in any manner until further legislation by Congress. On January 14, 1889, Congress passed an act “ For the relief and civilization of the Chippewa Indians in the State of Minnesota.” (25 Stat. L., 642.)
Section 1 of this latter act provided for the appointment by the President of three commissioners to negotiate with all the different bands or tribes of Chippewa Indians in the State of Minnesota for the complete cession and relinquishment in writing of all their reservations in said States, except the White Earth and Ned Lake Reservations, and so much of said reservations as, in the judgment of the commissioners, was not necessary to fill the allotments required by this act, said cession and relinquishment to be deemed sufficient when assented to by two-thirds of the male adults over 18 years of age residing and belonging to the several reservations, except as to the Red Lake Reservation, which required the assent of two-thirds of all the Chippewa Indians in the State, provision being made for a census to ascertain the percentage of assent, and upon approval by the President to become conclusive and irrevocable.
Section 2 provided for the qualification of the commissioners and fixed their compensation.
Section 3 provided ■ for the removal of all the Indians from their reservations to the White Earth Reservation, except the Red Lake Indians, who were to retain their own reservation. Individual allotments were to be made to the Red Lake Indians on their reservation, and all other Indians so removing were to be allotted lands on the White Earth Reservation, provided, however, that any individual Indian disinclined to remove to the White Earth Reservation might take an allotment on the reservation where he lived at that time.
Section 4 provided that subsequent to the cession and relinquishment the Commissioner of the General Land Office should cause the ■ lands to be surveyed the same as other *453 public lands, and after making report thereof to the Secretary of the Interior examiners appointed by the latter should go upon the lands, subdivide the same in 40-acre tracts, appraise at not less than $3 per thousand feet board measure the pine timber thereon, and classify the same into what should be known as “ pine lands ” and those without pine timber into “ agricultural lands.”
Section 5 provided for tire sale at public auction, after extensive public notice, of the “pine lands” mentioned in the preceding section. The pine lands were to be offered in lots of 40 acres each, and in no event to be sold for less than appraised value. The surplus lands failing to sell at auction should be sold at private sale under same conditions.
Section 6 provided for the disposition of the surplus of agricultural lands over the acreage required by the terms of the act. The agricultural lands were to be thrown open to homestead entries to actual settlers only at $1.25 per acre, and, saved by a proviso to said section, previous valid and subsisting preemption and homestead entries to be patented according to the decisions in force at the date of its allowance. It also gave to any person who had not theretofore had the benefit of the preemption or homestead laws and who had failed from any cause to perfect his title the right to avail himself of the provisions of this act.
Section 7 provided that all money accruing from the sales provided for in the previous section, after deducting the expenses incident to the surveys, etc., should be placed in the Treasury to the credit of the Chippewas as a permanent fund, to draw interest at the rate of 5 per centum per an-num for 50 years, said interest to be computed annually and disbursed in annual payments to the Indians: One-half of same to be paid to heads of families and guardians of orphan minors; one-fourth of same to be paid to all other classes of Indians; and the remaining one-fourth to be expended under the direction of the Secretary of the Interior for the establishment and maintenance of public schools. The principal fund was to be distributed per capita at the expiration of the 50-year period among the Chippewas then surviving. The United States further agreed to advance as *454 interest upon said fund the sum of $90,000 per annum and continue said advancement until the principal fund herein provided for, exclusive of deductions, should equal or exceed the sum of $8,000,000’, in which event the advancements made herein were to be repaid.
Section 8 simply provided for the necessary expenses of carrying into eifect the provisions of this act.
The respective bands of Chippewa Indians accepted the terms of the act of January 14, 1889, and executed in writing their assent thereto. The relinquishment of the claimant Indians will be found in full in Finding IX.
There was another treaty entered into between the same parties on March 19, 1867, the provisions of which simply changed the boundaries of the reservation ceded to the Indians by article 2 of the treaty of May 7, 1864. It does not modify to any considerable extent the previous status of the Indians, and throws no light upon the controversy referred by the special jurisdictional act.
On December 19, 1893 (28 Stat. L., 576), and again on May 27,1898 (30 Stat. L., 745), the Congress by joint resolutions validated the entries made upon claimant Indians’ reservation and directed the issuance of patents therefor if regular in other respects.
On May 27, 1902 (32 Stat. L., 268), the Congress appropriated $40,000 to pay claimant Indians for improvements upon their reservation upon condition of their removing therefrom and their acceptance in council of the provisions of this act. Provision was made for the reservation to any individual of the tribe of land purchased or leased by him from any person having title thereto from the Government.
The petition herein alleges that the claimant Indians, by virtue of the twelfth article of the treaties of 1863 and 1864, reserved to themselves the right of occupancy of the Mille Lac Eeservation as defined in said treaties; that they never by violation of the condition expressed therein forfeited said right until the same was voluntarily transferred to the United States by their assent to the act of January 14, 1889; ■that the United States failed to carry into execution the provisions of the act of January 14, 1889, and instead of *455 appraising and selling their pine and agricultural lands, did, by the resolutions of December 19, 1893, and May 27, 1898, by validating past entries and approving future ones, open to public settlement under the public-land laws all their reservation, of which they have been deprived. The damages claimed, aggregating three millions of dollars, are rested entirely upon the provisions for the sale of their lands found in sections 5, 6, and 7 of the act of January 14,1889.
The jurisdictional statute refers a claim; it determines no rights other than the one to litigate; provides a forum with authority to ascertain, adjudicate, and enforce rights. The question of damages alleged to have been suffered by claimant Indians must be determined by the court upon the same legal principles as appertain to controversies between individuals,' and while it defines the nature of the cause of action and recognizes the justice of its determination, it extends no further as respects the merits of the issue. (Stewart v. United States, 206 U. S., 185.)
The jurisdiction • of the court is challenged by the defendants. The contention is the plenary authority of Congress over Indian tribes and tribal property. The question of Indian policy is a political one, immune from the action of the courts. (Cherokee Nation v. Hitchcock, 187 U. S., 294; Lone Wolf v. Hitchcock, 187 U. S., 553.) The court recognizes the force of the decisions cited, and if this case came within them would dismiss it immediately. We are not dealing with acts regulating the administration of Indian property and Indian funds in the sense of their validity or invalidity. The question at issue rests upon the construction of treaties and acts of Congress and rights acquired thereunder. The authority of Congress in the premises is not questioned. The jurisdiction conferred extends to an inquiry as to what if any damages the claimants suffered by reason of an alleged taking of their property acquired under treaties which failed of execution because of acts of Congress. It is a warrant of authority to adjudicate results and not determine the means employed to bring about the same. In Cherokee Nation v. Hitchcock, supra, the court said: “ There is no question involved in this case as to the taking of property; the authority which it is proposed to *456 exercise, by virtue of the act of 1898, has relation merely to the control and development of the tribal property, which still remains subject to the administrative control of the Government, even though the members of the tribe have been invested with the status of citizenship under recent legislation.” Lone Wolf v. Hitchcock followed the Cherokee case, sufra, and the court therein was dealing with administrative measures designed to control Indian property, “ a mere change in the form of investment of Indian tribal property.”
This court has in the past considered numerous cases similar to this, one quite recently decided, The Ute Indians v. United States (45 C. Cls., 440), wherein a judgment for over $3,000,000 was awarded the claimants, and no appeal therefrom taken by the United States. The additional point as to the right of the claimants to sue as an individual band necessarily follows the development of the case and is determined thereby.
The proviso to article 12 of the treaties of 1863 and 1864, “ That owing to the heretofore good conduct of the Mille Lac Indians they shall not be compelled to remove so long as they shall not in any way interfere with or in any manner molest the persons or property of the whites,” is claimed as the basis of claimant Indians’ title to the Mille Lac Reservation. These two treaties, substantially identical in so far as this case is concerned, were negotiated in consonance with the general governmental purpose to acquire the Indian domain and at the same time provide equitably for the Indians until advancing civilization should absolve the Government from their care and maintenance. The Indians at this time were parting with their reservations, a transaction quite solemn on their part. Their savage reverence and almost holy attachment to their native habitats, the place of the burial of their dead, the country of their fathers, caused them more than once to cling to their reservations with a persistence that yielded only to the force of arms or the decrees of nature. They were always reluctant to move. The Mille Lacs, parties to the treaties, were jointly and commonly interested in the reservations of the Mississippi Chippewas, being ceded by the treaties, their assent to the treaties was, or at least was supposed to be, indispensable to its effective execution, and *457 the language of the proviso to article 12, repeated in both instruments, was intended for some purpose, and it manifestly-conferred some rights. Was it a reservation of their lands, the right to occupy the same under the express conditions of the reservation, or was it a mere license or favor, a temporary cession, a right of sufferance, as suggested by the .defendants?
The title to Indian lands vested in Indian tribes was the right of occupancy, the ultimate fee in the lands was in the United States, and the right of conveyance by the Indians was limited to the United States or to some one else by their express consent. This rule following the case of Johnson v. McIntosh (8 Wheat., 548) has obtained without interruption through the whole course of judicial procedure from that early time until the present day. (Jones v. Meehan, 175 U. S., 1; United States v. Winans, 198 U. S., 371.)
In construing Indian treaties ambiguities and doubtful clauses should be construed in favor of the Indians. This rule is ancient and elementary. It is predicated upon the disparity in intelligence between the contracting parties, the lack of a comprehensive written language for the Indians, and the innumerable and manifest opportunities to misinterpret the meaning of treaty stipulations. The intention and understanding of the Indian tribe of the rights secured to them by conventions of this character is of paramount importance, and councils at which they were ratified and confirmed are admissible in evidence to this end. They are not to be construed according to the technical meaning of the words employed, but in that generous and comprehensive manner which justice exacts in dealings between a strong and intelligent party on the one side and an illiterate and inferior party on the other. (Worcester v. Georgia, 6 Pet., 515; Choctaw Nation v. United States, 119 U. S., 1; Jones v. Meehan, supra, United States v. Winans, supra.)
A proviso to a statute (likewise a treaty) is purposed to qualify or except from the general operation and effect of the enacting part persons and property, or the conditions upon which persons and property will not be effected by the result sought to be accomplished. Likewise, it is imperative in ascertaining the intention of the parties to a contract ambiguous in terms, that all the surrounding circumstances and *458 conditions under which the transaction was consummated shall be taken into consideration.
It will be observed that the treaty of 1863 was executed on March 11 of that year. The date is important, for at the time the United States was engaged in war. In August, 1862, Hole-in-the-Day, a famous Chippewa chief, became hostile to the United States and attempted an uprising among the Indians, with intent to join forces with the then hostile Sioúx, whose terrible atrocities and fearful massacre of innocent men, women, and children terrorized the whole State of Minnesota. It was a disturbance much to be deplored at this particular juncture in the Nation’s history and fraught, as it was, with imminent danger to the poorly protected white people, whose soldiers, previously stationed among them, had been largely drawn into the service of the Government. Shaw-vosh-kung (a name as variable in spelling as pronunciation), the chief of the Mille Lac Band of the Chippewas, headed an expedition to extend relief, if necessary, to Fort Fisher, then in possession of Commissioner Dole, of the Indian Office, and 35 United States soldiers, declined to aid the hostility of Hole-in-the-Day, and by thus withdrawing his support and that of his band, in the neighborhood of 800 strong, and enlisting in the cause of the Government, frustrated the proposed massacre of the whites and forced the peace of the Indians. In a short time thereafter Commissioner Dole- gathered together the chiefs and headmen of the Chippewa bands and, accompanying them to Washington, assisted in and accomplished the execution of the treaty of March 11, 1863. It is conceded and incontrovertible that the consideration for the proviso in article 12 of both treaties was the services rendered the Nation by the' Mille Lac Band of Chippewas in declining to join and in assisting to prevent an Indian uprising in the midst of a civil war. This is the good conduct referred to in the proviso, and to this treaty the name of William P. Dole is attached. The language of the proviso would be difficult to construe in any other way than the granting of a right of occupancy to the Mille Lac Band. That they should not be compelled to remove was certainly equivalent to a right to remain. Remain where? Why, on the Mille Lac Reservation, for all *459 other reservations had been by the treaty ceded to the Government. Were the Mille Lacs engaged in the meaningless ceremony of ceding away all their right to the lands to which they were attached with a fondness heretofore described? Was the discrimination in their favor the reward for their signal services of loyalty, a granting of a mere license to live on their reservation, bury their dead there, build their improvements, and then to be dispossessed at the pleasure of the advancing whites ? The governmental policy at the time, as since, was to encourage the Indians to take permanent places of abode, improve their reservations, cultivate the soil, and otherwise acquire the habits and industry of the whites. Every article of the treaty abounds in generous promises of material assistance to this end. Their tenure, it is true, was conditioned upon good behavior toward their white neighbors ; but can it be said that this alone converted the ordinary title of right of occupancy into an anomalous Indian title, one of license and favor? Defendants urge that the condition anticipated settlement of the lands by the whites and the interference inhibited was to approaching settlers. Is it not more reasonable to suppose it referred to the neighboring whites, those adjoining the reservations? It could not possibly have meant any whites on the reservation at the time, for the law expressly prohibited their presence on an Indian • reservation. Article 3 of the treaty set aside $20,000 to pay for depredations committed by the Chippewas in 1862. Is it not just as reasonable to suppose that the provision intended a restraint upon further conduct of this character ?
Commissioner of Indian Affairs Price, in an exhaustive letter upon this subject, written in April, 1882, in analyzing this feature of the claimants’ title, said:
’ “ Manifestly, I think, reference was intended to the white settlers occupying the surrounding country, their neighbors especially, for there could have been no whités lawfully living upon the reservation at that time, and it was hardly intended in anticipation of the entry and settlement of whites upon the reservation and with a view to their protection, for the Indians being in occupation, the introduction of whites into their midst would unquestionably result in conflict at once; indeed, it is not difficult to see that such common occupancy by Indians and whites would be quite impossible. *460 The Indians were there, and until they were removed, either by their own consent or by reason of the forfeiture of their right of occupancy, the whites manifestly must keep out. * * * jror the sake of argument, let us suppose that the language of the proviso was intended to apply to settlers coming upon the reservation. Then the Indians, if they would not work a forfeiture of their right of occupancy, must not interfere with or molest either the persons or property of such. Surely nothing more. It does not provide that they shall make way for or vacate or abandon any improvements or shelter they have or land to these people. It is only required that they shall not interfere with or molest either their persons or property. These words (‘interfere’ and ‘ molest ’), when employed in such connection in respect of the conduct or action of Indians, are, I think, to be interpreted in their worst sense. And when it is remembered that only a few months before the treaty was made the whole country there had been thrown into a state of the greatest alarm on account of the uprising of the Indians of that section, it is clear to my mind that the framers of the treaty intended that they should be interpreted in on other way,” ■
The qualifications to the reservation were in most respects surplusage. If the Indians had persisted in bad conduct toward the whites, if they had assumed a hostile attitude toward the people and the Government, the military arm of the United States would have promptly interposed. In addition to all this the Government made no effort by treaty or legislation to dispossess said Indians or in any manner disturb their occupancy of this reservation until 1886, notwithstanding the violent and most persistent controversies, sometimes favorable, sometimes unfavorable, going on between the Land Office and anxious entrymen.
In some Indian treaties the right to hunt over and fish in the waters adjoining the ceded reservation is excepted from the treaty, and in some instances express words have reserved rights to the ceding Indians. The language used to establish said reservations has most generally been positive and unambiguous, leaving no doubt as to the intention of the contracting parties. If a mere license to pursue game was intended, apt language expressed the same; if possessory rights were conferred, doubts as to the extent of title were removed by the context of the article creating the same. (Kappler’s Treaties, vol. 2, pp. 19-22.)
*461 No mere license to fish and hunt was conferred upon the Mille Lac Indians by article 12 of the treaty of 1864; if so, the language used would have clearly expressed the same. The distance between White Earth and Mille Lac negatives this intention. What other Indian right then could have been intended save the right of occupancy? The word “ remove ” as used in the treaty has especial reference to a change of residence, for that was the subject matter of the negotiations. The Mille Lac Indians resided on their reservation and had been there since 1855. If they intended to cede their lands and at the same time reserve to themselves a right of residence thereon, a possessory right as strong as they could possibly acquire, then the treaty could have no application to their particular lands, and served as a conveyance of their cotenancy rights in the common reservations of the tribe. It confirmed rather than extinguished their rights under the treaty of 1855. The language of article 12 is not ambiguous and if considered apart from the context of the whole instrument could convey but one meaning. And when considered in connection with the context of the treaty, the purposes to be accomplished, and the circumstances attendant thereon, its meaning is in accord with similar provisions in previous Indian treaties. Why, this very article in the treaty of 1864 by a subsequent provision reserves to the Sandy Lake Indians a coextensive right with the Mille Lacs. The provisos were unquestionably inserted as favorable clauses to secure the free assent of the Indians to the treaties; they were the result of negotiations and the final contract of the parties. They are not unusual or anomalous. There is nothing mysterious about them, for many Indian treaties provide extensive exceptions. The very term “treaty” contemplates a series of mutual concessions and reservations to define explicitly the rights of the contracting parties, and Indian treaties were no exception to the rule.
The White Earth Reservation carved out by the treaties and embracing a vast acreage of land was 150 miles distant from the Mille Lac Reservation. It was to this reservation the Chippewas were to be removed by the articles of the treaties, and extensive appropriations were made to improve *462 it and to provide for schools and other civilizing influences. Many comforts, advantages, and conveniences were open to the Mille Lacs if they would remove. The inducements were all extended to accomplish the removal of the Indians to secure a cession of their lands that they might be thrown open to public settlement. Under all these circumstances it seems improbable that astute and experienced Indian officers charged with the special duty of securing this treaty would overtly and intentionally leave upon an Indian reservation a large band of loyal Indians 150 miles away from the reservation provided for the other bands with no greater security of title, no greater right than one subject to the cupidity, as it afterwards proved to be, of covetous lumbermen.
Numerous Indian cases have been before this court involving millions of acres of land and millions of dollars in money, but in no one of them, after a most careful examination, can the court find a contention similar to this, wherein Indian title is made to rest upon sufferance, as distinct from their right of occupancy, the greatest title they could possess. It is said by the defendants that the provision in article 4 for the improvement of 70 acres for the Mille Lac Band on the White Earth Reservation evidences an intention to effect their removal thereto. The answer to the contention is twofold. First, why didn’t they do it? The opportunity was at hand, and the Indians were at peace and assented to the treaty. Second, the language of the proviso gave the Mille Lacs an option, a right of election to remain or go. “ They shall not be compelled ” is the language of the proviso. They elected to remain, and during the subsequent years of their occupancy fulfilled the conditions of their tenure, a fact fully attested by every Indian agent and every other witness in the record. It is conceded by the defendants that the claimant Indians did not molest or interfere with the persons or property of the whites. It is true that evil practices contaminated to some extent the personal conduct of individual Indians. The introduction of whisky was the prime cause. White Earth was not free from the same evil and the surroundings there as respects the opportunity to procure and indulge intemperately in this commodity were about the same as at Mille Lac.
*463 Tbe Mille Lac Indians understood at tbe time of the execution of tbe treaty that they were securing and reserving to themselves tbe Mille Lác Reservation. The treaty, as before observed, was negotiated in Washington, and no record of the proceedings incident thereto is available. Senator Henry M. Rice, a gentleman of large Indian experience, a devoted and trusted friend of the Indians, was one of the commissioners appointed to assist in the procurement of the treaty, and his name is affixed to the treaty of 1863. In 1889 Senator Rice was again selected to secure the assent of the Indians to the act of January 14, 1889. On October 2, 1889, on the Mille Lac Reservation, addressing a council of the Mille Lac Indians assembled for this purpose, he used this language : “ I wish to refer to an old matter that has given you a great deal of trouble. That is the treaty made at Washington some 25 years ago. I was there, and know all about it. It was a wise treaty, and if it had been properly carried out you would have escaped all the trouble that has befallen you. Men who cared more for themselves than they did for you thought they had found a hole in it, and they would take advantage of that and deprive you of your rights. They knew that the Government was engaged in a great war which occupied all its time. They thought that under the circumstances they would be able to drive you from this reservation. * * * The time has come when I am able to tell you that all he said, all I have said to you, all the chiefs told you who were there and made the treaty, is correct. Here is the acknowledgment of the Government that you were right, that ‘ you have not forfeited your right to occupy the reservation.’ ”
On May 15, 1886 (24 Stat. L., 44), the Congress appropriated $15,000 to enable the Secretary of the Interior to negotiate with the several tribes and bands of Chippewas in Minnesota for modification of existing treaties and such changes in their reservations as might be deemed desirable and best by the Indians and the Secretary. In pursuance of the above act the Secretary appointed Hon. John V. Wright, a jurist, Bishop H. B. Whipple, and Hon. Charles F. Larrabee to carry forward the negotiations. On October 9, 1886, on the Mille Lac Reservation, Mr. Larrabee, in ad *464 dressing the Indians in council assembled in the course of an attempt to secure their removal from Mille Lac to White Earth Eeservation, used these words: “ Long ago you peded your reservation to the United States, with the understanding, however, that you were not to be compelled to remove so long as you did not molest or interfere with the persons or property of the whites. That is all the rights you have in this land — a very feeble tenure.” On the following day the Mille Lae Indians expressed great surprise at the statement of Mr. Larrabee, and in more than one public address disclaimed his construction of the treaty, contended for their right of occupancy, and finally grew so indignant over the matter that they withdrew from the council and terminated the negotiations. A subsequent council called for the same purpose, conducted by the same parties, again proved abortive because of a similar statement conveyed to the Indians by the commissioners and supplemented by a written opinion of the Secretary of the Interior. In 1889 and again in 1902 the Indians persisted in their right of occupancy and approved agreements with the distinct understanding that all claims under the former treaties should be preserved. Their complete understanding of the treaty is manifested not only by their words spoken in council meetings, but by the dogged persistence with Avhich they retained their residence on the Mille Lac Eeservation under most discouraging circumstances until subsequent to the cession of 1889.
In the case of California and Oregon Land Co. v. Worden (85 Fed. R., 94) the Congress in 1864 granted to the State of Oregon alternate sections of public land for three sections in width, to aid in the construction of a military road. Subsequently it appeared that the land so granted was embraced within Indian country. A treaty negotiated with the Indian owners of the land in the same year secured a cession to the United States of the Indian lands, with a proviso, however, that a particular tract embraced within the general cession should be set apart as a reservation for the Indians until otherwise directed by the President. All the lands to the extent of 130,000 acres taken under the congressional grant were located within the lands set apart by the proviso. Plaintiff’s contention was predicated upon the general cession *465 of all the Indian lands embodied in the first articles of the treaty, insisting that the proviso was a reservation subsequent to the vesting of their title and invalid. The court held that the Indians had not by the terms of the treaty ceded title to their reservation; that it was not a cession and recession of reserved lands, but a mere reservation to the Indians of the same right and title they originally had. This case is exceedingly apropos.
In United States v. Winans (198 U. S., 371) the Supreme Court construed a treaty with the Yakima Indians made in 1859. The Indians by the treaty ceded to the United States their vast estate except a certain reservation. Article III of the treaty provided for an exclusive right of taking fish in all streams running through or bordering on their reservation and a similar right at all usual and accustomed places in common with the citizens of the Territory. Subsequently the ceded lands were patented and the Indians were excluded by the owners in fee from the fishing privileges guaranteed by the treaty. Respondents contended that the Indians’ rights under the treaty were no greater than the white man’s under conditions of absolute ownership; that the fee being in him he had a right to exclude the Indians from his premises. The court said in overruling this contention, “In other words, it was decided that the Indians acquired no rights but what the inhabitants of the Territory or State would have. Indeed, acquired no rights but such as they would have without the treaty. This is certainly an impotent outcome to negotiations and a convention, which seemed to promise more and give the word of the Nation for more. * * * In other words, the treaty was not a grant of rights to the Indians, but a grant of rights from them — a reservation of those not granted.” (Spalding v. Chandler, 160 U. S., 394.) If the privileges granted by Article III of the above treaty were superior in extent and duration to a mere license, it is quite difficult to reconcile the taking of a home — a supposed place of permanent abode — with the idea of such feeble and uncertain tenure as an estate by sufferance. (United States v. Thomas, 151 U. S., 577.)
*466 The act of January 14, 1889, following as it did years of discussion as to tbe rights of the Mille Lac Indians to their reservation, would seem to confirm their title in every respect were it not for the second proviso to section 6 thereof. This proviso, validating certain homestead and preemption entries made on Chippewa lands, and extending additional privileges as to entries not theretofore perfected, brings forth a defense that this act does not apply to the Mille Lac Reservation. In other words, the restrictive provisions applying to the sale of the Indian lands extends only to the diminished White Earth, Red Lake, and other reservations not embraced in the cessions of 1863 and 1864. Defendants’ contention is rested upon the various and conflicting decisions of the Interior Department emanating from controversies in the General Land Office. The Mille Lac Reservation, like all the other Chippewa reservations in Minnesota, was rich in pine timber. Squatters had sought to acquire rights in this particular reservation prior to 1871, and the complaints about the same were numerous and persistent. The timber lands were valuable in 1864 and enhancing in value as time progressed. As soon as the treaty of 1864 was proclaimed this controversy arose. If the reports of regular and special Indian agents are to be credited, it was conceived in fraud and developed by deceit and circumvention. The findings show that as early as November 13, 1871, the special agent in charge of Indian affairs in this locality, in conjunction with a special representative of the Indian Office, after a detailed and special examination of all the entries for land up to that date, denounced practically every one of them of every class and description as fraudulent and corrupt. The entries were not made in good faith, but with a notorious attempt to preempt the pine lands to the exclusion of agricultural lands. We have examined with great care the opinions of Secretaries of the Interior Chandler and Teller, alleged to be adverse to claimants’ contention. In each of these opinions the rights of the Mille Lac Indians, acquired under the treaties of 1863 and 1864, are fully respected. Secretary Chandler suspended his decision to await legislation in behalf of claimants, and Secretary Teller confirmed claimant Indians’ right of occupancy to so much of the Mille Lac Reservation actually nec *467 essary for tbeir habitat. An opinion of Secretary Lamar, conveyed to the Mille Lacs in council in 1886, is quoted as adverse to claimants’ contention. The opinion is set forth in-the findings. Its brevity alone arouses the suspicion that the Secretary had probably subscribed to a document prepared by some subordinate in the Land Office. It seems most improbable that a jurist of such great eminence would dismiss a subject of such magnitude and prolonged discussion with so few words. The opinion supplementing another at the same time would seem to have been prepared in haste and for the avowed purpose of securing the assent of the Indians to the act of 1886, and which we submit does not in any way negative the conclusions reached herein. Up to January 14, 1889, four Secretaries of the Interior and at least two Commissioners of the General Land Office had delivered conflicting opinions in respect to the claimants’ title to this reservation. The greater proportion of the land entries received and entered by the officials of the local land office were so made in direct violation of express orders from the Interior Department prohibiting the same, an infraction and disobedience which finally became so acute as to result in the dismissal from the service of one of the offending officials.
The defendants in this case ask for a specific finding of a conspiracy between eminent public. officials and the local land officials at Taylor Falls, Minn., to enter over 23,000 acres of this reservation, which was at the time thwarted by the vigilance of the Interior Department. In 1884 Congress halted the whole proceedings, and with the exceptions noted in the findings patents were suspended and entries prohibited. In 1886 Congress attempted the removal of the claimants to make way for settlers and failed. Therefore, in 1889 Congress had before it a controversy with respect to Indian pine lands extending over a period of 18 years. The legislation then enacted superseded the general-land laws, conserved the valuable resources of the Indians, and threw around the disposal of their pine such positive restrictions as to prevent its fraudulent acquirement. Why this great necessity to erect barriers against fraud and corruption save the prevalence of this stealthy practice as against these claimants ? Are we to presume that the salutary legislation *468 of 1884 was repealed by a proviso in an enactment made for the general purpose of forestalling the very thing the act of 1884 did prohibit? Repeals by implication are not favored in law. The debates in Congress incident to the passage of the act of January 14, 1889, indicate a legislative intention to prohibit by the terms of the act the unwholesome and corrupt practices previously obtaining as to the acquirement of Chippewa timber lands. - If this proviso was intended to ratify repeated transactions, for the most part fraudulent in character previously committed, and leave the statute operative only as to future transactions, it was a most singular division of justice between unoffending parties. The language of the proviso negatives such contention. Only “ subsisting, valid, preemption, or homestead entries ” were to be proceeded with and in accordance with the decisions in force at the date of its allowance. Can it be contended that this language embraced that large and most numerous class of claims entered in positive violation of express instructions? Can it be said that a single case now in issue respecting pine lands, in view of the numerous and conflicting decisions of the Secretaries, was stare decisis at the time of its allowance? At the time of the passage of the act of January 14, 1889, comparatively few patents had been issued as against claimants’ lands and absolutely no continuity of decision or construction of law had obtained in reference to rights of entrymen. On the contrary, it was unsettled and uncertain. The language of the proviso only authorized future proceedings in accordance with settled law. In fact, the second and third provisos to section 6 of the statute do not relate at all to pine lands. They are applicable only to agricultural lands and were eminently fair and just. The entire section is devoted to the disposal of agricultural lands and the provisos save to bona fide settlers their lights under the laws in force at the time of their filing. The second proviso, confirming this position, absolutely protects the Indian rights in these same lands and in no wise injuriously affects the generous provisions as to disposition of funds arising from their settlement. The stringent provisions found in the first proviso to section 6 are intended to prevent a recurrence of the particular frauds practiced to *469 secure patents which had so generally obtained as to the pine lands. No provision whatever is made for a public settlement upon pine lands; they were to be disposed of by public and private sales. The act in question was securing to the United States a cession of at least 3,000,000 acres of Indian land, the classification of the same being preliminary to its disposition in favor of the Indians. Congress recognized the paramount value of the timber tracts and the danger of their acquirement by lumber corporations for a nominal consideration. The agricultural lands, not so valuable, and hence not so inviting, were to be opened under the provisions of the law to bona fide homesteaders, and the rights of the comparatively few in number who had, in good faith, intending to secure a home, filed thereon were to be respected.
The Department of the Interior, the commissioners appointed by the President to procure the assent of the Indians to the act of January 14, 1899, all treated the Mille Lac Indians as coming within the purview of its provisions. A council extending over several days was held on the Mille Lac Reservation to secure their approval thereto; they were positively and repeatedly assured by the representatives of the Government that they were within its terms; and their written relinquishment of their title to the same, executed by a majority of the tribe residing on the reservation, was secured upon the faith of said representations. Absolutely no doubt existed then as to the scope of the law or its applicability to claimant Indians. The fact of allowance of homestead entries to the chief of the band and his son argues little. We need not cite authorities to sustain the proposition that the Interior Department is entirely without authority to issue valid patents to Indian lands. (United States v. Carpenter, 111 U. S., 347.) If these patents are at all valid, they must rest upon treaty rights or statutory law.
The Mille Lac Indians were the only band mentioned in the treaties of 1863 and 1864 subsequently asked to relinquish their reservation under the act of January 14, 1889. Surely their status was something different from that of their ancient allies.
The Congress as late as July 22,1890, treated the Mille Lac Reservation as Indian lands, for on that date an act was ap *470 proved granting a railway company a right of way and other privileges through and upon the reservation, expressly reserving to the Mille Lacs in their tribal capacity the damages incident thereto. (26 Stat. L., 290.)
The technical language used in the written instrument subsequent to claimants’ assent to the act of January 14,1889, is cited as indicating a difference in title as to claimant Indians. The use of the word “ relinquish ” when speaking of the Mille Lac Reservation-as distinguished from the word “cede” when referring to the White Earth and Red Lake Reservations can hardly be relied upon in the determination of Indian title. The words are frequently used in Indian treaties con-junctively, and in so far as they affect the conveyance of Indian title the employment of either word would effectively divest the Indians of their right of occupancy. It is quite true that to the trained lawyer they have a distinct technical significance, but are so, nearly synonymous that even they employ them carelessly. In construing Indian treaties their technical significance vanishes.
In Worcester v. United States (6 Pet., 236) Chief Justice Marshall, in language so directly applicable to this case that we cite it in full, said: “ It is reasonable to suppose that the Indians, who could not write, and most probably could not read, who certainly were not critical judges of our language, should distinguish the word ‘ allotted ’ from the words ‘ marked out.’ The actual subject of contract was the dividing line between the two nations, and their attention may very well be supposed to have been confined to that subject. When in fact they were ceding lands to the United States and describing the extent of their cession, it may very well be supposed that they might not understand the term employed as indicating that instead of granting they were receiving lands. If the term would admit of no other signification, which is not conceded, its being misunderstood is so apparent, results so necessarily from the whole transaction that it must, we think, be taken in the sense in which it was most obviously used.” The rule established by this case has been followed by the Supreme Court in construing Indian treaties ever since. (Jones v. Meehan; United States v. Hitchcock; United States v. Winans; Cherokee Intermar *471 riage Cases, 203 U. S., 76, all heretofore cited; and many other cases too numerous to mention.) It is well-settled law.
The Mille Lac Indians in this instrument expressly recited that they were dealing with the Mille Lac Reservation occupied and belonging to them “ by virtue of a clause in the twelfth article of the treaty of May 7, 1864 (13 Stat., p. 693).”
Lastly, granting, arguendo, but not conceding the force of the defense, then in that event the provisos to the act of January 14,1889, were the initiatory legislation subsequently confirmed by the resolutions of December 19, 1893, and May 27, 1898, which deprived claimant Indians of their right of occupancy in the Mille Lac Reservation. The jurisdictional act provides for the assessment of damages “by reason of the opening of the Mille Lac Reservation only * * * to public settlement under the general land laws of the United States.” If this legislation served the purposes contended for by defendants, it likewise opened to public settlement claimants’ reservation by confirming all the entries made thereon previous to its enactment, and the various amounts provided for the Indians can well serve as a basis for damages in this cause.
On January 9, 1891, the Interior Department decided the case of Amanda J. Walters. (12 L. D., 59.) The claimant in the case had previously been allowed to make entries on the Mille Lac Reservation, and the issue was her right to a patent therefor. The Secretary confirmed her right of patent, resting his decision upon the second and third provisos to section 6 of the act of January 14, 1889, asserting therein that said provisos constituted the further legislation provided for in the act of 1884 annulling all the aforesaid entries. The decision mentioned is another of the numerous conflicting views indulged by the Land Office officials in connection with this long controversy. (5 L. D., 102, 541; 8 ib., 409; 10 ib., 2; 13 ib., 230; 14 ib., 497; 22 ib., 388.) The decision in the Walters case was followed in September, 1891, by the case of N. P. B. B. Go. v. Walters (13 L. D., 230), sustaining the claim of the claimant Indians to their right of occupancy of their reservation, holding the same was in force until ceded by the act of January 14, 1889, and on *472 April 22, in an opinion by Secretary of the Interior Noble (14 L. D., 497), the rulings in the previous opinion were applied to prevent entries under the general land laws.
The resolution of December 19, 1893 (28 Stat. L., 576), by its terms was simply intended by the Congress to protect bona fide homestead filings or entries upon the Mille Lac Eeservation which had been made subsequent to the rulings in the Walters case, and by virtue thereof, and before the contrary holding in the N. P. E. E. Co. case, made on April 22, 1892, and under the opinion of April 22, 1892, the remaining agricultural lands of the Mille Lac Eeservation were opened to homestead entry under the terms and provisions of the act of January 14,1889.
The resolution of May 27, 1898 (30 Stat. L., 745), enacted as it was to put an end to the land-office controversy by which the whites were first let in and then put out, unquestionably ratified all previous entries and interposed to deny the claimants the benefits of the act of January 14, 1889. It divested them of their reservation and under its provisions the. lands upon which they so long resided have been almost, if not entirely, taken up by white settlers and lumber companies.
The act of May 27, 1902 (32 Stat. L., 268), appropriated $40,000 to pay the Mille Lacs for the improvements made upon their reservation. It can not affect this controversy and was at the most a tardy and almost inconsequential recompense to secure their removal from a reservation from which they had already been excluded by being divested of their Indian title, and upon which they had remained because of the failure to extend to them the benefits of the act of 1889. All the treaties with the Mille Lacs provided payment of expense of removal to their new reservation. The Congress by the terms of this act recognized their possession of the reservation as a tribe by authorizing the amount appropriated to be paid in accordance with tribal law adopted in council proceedings. The Indians in assenting to the above act reserved in writing all rights to which they were entitled under existing treaties or agreements, and notwithstanding the statements of the commissioners to the Indians that they had no title to the lands (a statement repeatedly contradicted by the Indians), they were assured *473 by them, that their assent to the act of 1902 did not in any wise affect their assertion to prior claims arising under previous agreements and treaties. It must not be overlooked that under the act of January 14, 1889, the Mille Lacs were entitled to allotments on their reservation in common with the other Indians.
It has been most forcibly brought to the attention of the court that a judgment in this case results in a double payment to the Mille Lac Indians. In some respects this is true. It can hardly be said to be a double payment, but is more in the nature of an additional allowance or a supplemental benefit, which in any case accrues alike to all the Mississippi Chippewas mentioned in the treaty of 1864. The Mille Lacs have participated in the annuities allowed by the treaties of 1863 and 1864, and the few of the minority of the tribe who removed to the White Earth Reservation received the benefits of treaties, but the great majority of the tribe — the real Mille Lac Band, who remained on the Mille Lac Reservation — received no benefit from the provisions of the treaties providing for schools, blacksmith shops, agricultural implements, etc., on the White Earth Reservation until their removal thereto. In fact, the Mille Lac Indians remained on their reservation, claiming title thereto under the treaty of 1863, without the numerous advantages and profitable perquisites granted to the other bands of Mississippi Chippewas who did at the time remove to the White Earth Reservation. They withstood at times the most intense poverty, and while they were of good reputation among the neighboring whites, under most adverse circumstances, they willingly forbore many of the advantages of White Earth to occupy their ancient home. Under the act of January 14, 1889, they are, and under all other treaties and agreements were, entitled as fully as any other Chippewa Indian Band to the full and complete advantages and emoluments derived from the disposition of Chippewa lands held in common by the tribe. The exception granted to them was a reward for their patriotic conduct in 1862. It rests upon no other consideration, and would fall far short of accomplishing the purpose if they were held to have released all their rights in the vast area of lands set apart for the Mississippi Chippewas and *474 received in turn simply their own reservation without the means of livelihood or improving the same. As was well said in the argument of the- case, it was too great a bonus to pay. If payment is now denied them the reward was an empty promise, the sacrifice of years a needless hardship.
In any event the argument is devoid of merit. The question is not one which goes to the considerations for the treaties or benefits to be derived therefrom. That is for the political department of the Government. The courts are confined alone to an interpretation of what rights did accrue, and not as to their justice or injustice. The Congress is Vested with complete authority to determine questions of this character, and its jurisdiction is exclusive.
In United States v. Choctow, etc., Nations (179 U. S., 541) Mr. Justice Harlan, speaking for the court, said:
“ Now, it is argued that if the interpretation placed by the United States upon the treaty of 1866 with the Choctaws and Chickasaws is accepted the result will be that the General Government has been more liberal toward the Seminóles and Creeks than it has been with the Choctaws and Chickasaws. ' But that can not constitute a reason why the court should depart from the ordinary signification of the words used in the treaty with the Choctaws and Chickasaws. If Congress chose to adopt one course toward the Seminóles and Creeks and a different course toward the Choctaws and Chickasaws, it is not for the judiciary to defeat the will of the legislative branch of the Government by giving to an Indian treaty a'meaning not justified by its words.”
In any event it is quite doubtful if any advantages will accrue to the Mille Lac Indians in view of the judgment that will hereafter be rendered in this case. 'Whatever inequality may appear is minimized by the terms and provisions of the act of January 14, 1889. This statute marshals the proceeds from the sale of all the Indian lands therein mentioned and extends to all the Chippewa Indians in Minnesota the right to participate therein. Thus it will be seen that the amount accruing to the Mille Lacs by reason of the opening up of their reservation to public settlement will become a part of the general fund provided for in the act of 1889.
*475 The treaties of 1863 and 1864 reserved to the claimants the Mille Lac Reservation. They remained as a band in open, notorious possession of the same, a lawful notice to the world of a claim of title, until the resolutions of the Congress opened their domain to public settlement and divested them of title to their lands. They fulfilled all the conditions of the tenure, remained at peace with the whites, and were fully entitled to the benefits of the act of January 14, 1889, which were denied them. (United States v. Thomas, 151 U. S., 577.)
The court is unable to reconcile a conceded right of occupancy to Indian lands with the doctrine of limited and circumscribed tenure by license or mere favor. It is certainly most unusual and an anomalous estate not heretofore carved out of Indian lands. It is repugnant to every intendment of the Government in its conduct toward the Indians, and confuses rather than adjusts the settlement of Indian affairs. It can not be claimed as just to the Indians, failing, as it must, to bring about that permanent repose continually sought for in Indian treaties and acts of Congress. The various conflicting opinions of the Department of the Interior were the result of this contention and have carried this controversy through the long years of its existence.
The jurisdictional act is comprehensive, its evident intention being to afford relief to the clamaints mentioned therein for damages suffered by them as a band or by the Chippewa Indians of Minnesota. The language of the statute, “ a suit or suits to be brought by and on behalf of the Mille Lac Band of Chippewa Indians in the State of Minnesota * * * on account of losses sustained by them or the Chippewas of Minnesota,” precludes the idea of technical objections interposed to limit the parties interested. The suit under this jurisdiction may be brought by the Mille Lac Band of Indians for alleged damages to them as a band, or for dam-' ages accruing to the Chippewas of Minnesota by reason of injuries to them as a component part of the Chippewa tribe. It is conceded that the Congress possesses plenary power in reference to the disposition of Indian tribal lands and tribal funds. The jurisdictional act passed subsequent to the act *476 of January 14, 1889, wherein distinct provisions are made with reference to the disposition and division of tribal funds and lands, anticipated ,the very situation which now exists, and intentionally broadened the jurisdiction conferred to the extent of embracing this entire controversy within the terms of the statute, whether the damages occasioned were suffered by the Mille Lac Indians separately or to the Chippewas of Minnesota. If it were not for the act of January 14, 1889, the right of the Mille Lac Indians to prosecute this action in their own name would be indisputable. The act of January 14,1889, by its terms, however, provides for an equitable distribution of the funds arising from the sale of the lands of the Chippewas therein mentioned by saying in section 7 thereof that the distribution shall embrace “ all the Chippewa Indians in the State of Minnesota.” Thus it is apparent that the Mille Lac Indians, as a band, were entitled to institute these proceedings under the jurisdictional act, and that the judgment recovered must be subject to distribution, as provided by the act of January 14,1889. The claimants having brought themselves within the provisions of the act of January 14, 1889, the congressional disposition of their tribal lands and funds follows the same. This would be so even in the event of an individual judgment to the Mille Lac Indians as a band. The jurisdictional act in nowise modifies or repeals the act of January 14, 1889. The law of 1889 being the latest legislation respecting the disposition of Chippewa tribal lands and funds arising thereunder, would apply the judgment as therein provided, for the act of 1889 controls in the matter of management and distribution of Chippewa lands and funds. (Lone Wolf v. Hitchcock, supra.) Courts are constrained to give effect to jurisdictional statutes where the intent of the legislature can reasonably be inferred from the language thereof to vest authority to judicially ascertain the merits of the controversy. (Supervisors v. Stanley, 105 U. S., 305.) Doubts are to be resolved in favor of juristion, unless some established law is violated. (Endlich on Statutory Construction, sec. 430; Butler & Vale v. United States, 43 C. Cls., 497.)
The situation of the parties herein concerned corresponds to the relief intended by the jurisdictional act. The Mille *477 Lac Indians occupied one of the reservations included in the act of January 14,1889, and their assent thereto was secured. If no controversy was possible over their title to the reservation, their lands could have been classified, sold, and the proceeds arising therefrom disposed of in exactly the same manner as the other Chippewa Indian lands included in the act, i. e., the Mille Lac’s fund would have become part of the general Chippewa fund created by the act of 1889; hence the clause in the jurisdictional act extending the relief to damages occasioned to them or the Chippewas of Minnesota. It is similar in all respects to a suit by the Mille Lac Indians for the use and benefit of the Chippewa Indians of Minnesota. The statute recognized the peculiar relationship between the Mille Lac Band and the other bands of Chippewa Indians as created by the act of 1889 and provided authority to investigate the subject matter of the controversy as presented to the Congress at the time.
The court has experienced great difficulty in attempting to reconcile the testimony in reference to the acreage, and value of the timber thereon, contained in this reservation. The conflicting statements of the witnesses are so wide apart as to make it impossible for the court to accept either the highest or lowest estimate of the amount. Taking into consideration the testimony of the witnesses and the records of the Interior Department submitted herein, we have reached the conclusion that the Mille Lac Indian Reservation contained Cl,028.14 acres of land; that 25,000 acres of said land was swamp or agricultural land upon which no pine timber grew; that upon 34,860.89 acres of said land there was standing 100,000,000 feet of pine timber; and that 1,667.25 acres of said land was reserved for various purposes in the various treaties hereinbefore mentioned.
The amendment to the act of January 14,1889 (25 Stat. L., 642), fixing the minimum price of Norway pine at $4 per thousand feet on the stump and white pine at $5 per thousand feet, made it necessary for a careful investigation of the record in reference to the percentage of the different kinds of pine. Upon this subject the record is entirely silent and it has been absolutely impossible to ascertain with any degree of accuracy whatever the quantity of Norway and white *478 pine thereon. In view of this situation the court has treated all the timber as coming within the lower classification, namely, Norway pine, and allowed therefor at the rate of $4 per thousand feet, making a total of $400,000,, to which must be added the amount of $31,250 for the agricultural or swamp lands at $1.25 per acre.
The act of 1889 provided for interest at the rate of 5 per cent per annum on the sums received from the sale of the lands therein mentioned, and the United States expressly agreed to advance the sum of $90,000 per annum to pay said interest until the accumulation should be of sufficient amount to reimburse them for this outlay.
Under this statute there must be added to the principal amount the accumulated interest at the rate of 5 per cent per annum for 15 years 5 months and 9 days, which makes the total sum of $764,210.89, for which amount judgment will be entered in favor of the Mille Lac Indians of Minnesota, to be distributed under the act of 1889, as therein provided, to all the Chippewa Indians of Minnesota.
It is S0‘ ordered.
Judge Howry reserved his' opinion.