LittletoN, Judge,
delivered the opinion of the court:
Tiie claim presented in this case by the Sioux Tribe is for just compensation for the alleged taking for public purposes or the misappropriation by the defendant, by the act of Congress of February 28, 1877, 19 Stat. 254, of land and rights in land, amounting to 73,781,826.19 acres, without the payment of compensation therefor and contrary to and in violation of articles 2, 12, 15, and 17 of the treaty concluded April 29, 1868, ratified February 16, 1869, and proclaimed February 24, 1869, 15 Stat. 635 (finding 3), and certain provisions of the treaty of September 17, 1851.
The record is voluminous, but there is no serious dispute concerning the essential facts pertinent to the legal phase of the claim presented as to what the Government did and the reasons therefor. Plaintiff Indians say that because article 2 of the treaty granted the property to them for their “absolute and undisturbed use and occupation” and that because the Government through an act of Congress in 1877 acquired the property without the consent of three-fourths of the male adult Indians having been first obtained, as provided in article 12 of the treaty, there was a “taking” of the property and a “misappropriation” thereof, and relies upon Shoshone Tribe of Indians v. United States, 299 U. S. 476, and United States v. Greek Nation, 295 U. S. 103. The defendant says that the Congress acted within the scope of its plenary authority over Indian tribes, and relies upon Lone Wolf v. Hitchcock, 187 U. S. 553.
If the lands or other property rights of plaintiff were misappropriated or taken by the United States in violation of the treaty of 1868, and contrary to the authority which *658 Congress possessed under the treaty and the law governing the rights of the parties, without the payment of compensation therefor and under such circumstances as to give rise to an- implied contract to pay just compensation for the property taken contemporaneously with the misappropriation'or taking, plaintiff is entitled to recover. But if, under the circumstances disclosed by the record, Congress acted within the limits of its authority under the law and the treaty in acquiring the lands and hunting rights for which it made compensation, the plaintiff is not in our opinion entitled under the terms of the jurisdictional act to recover.
The facts and circumstances narrow the legal issue between the parties to the question whether under the treaties of 1851 and 1868 and the act of February 28, 1877, the plaintiff tribe has any legal and enforceable claim within the meaning of section 1 of the jurisdictional act upon which the court has authority to inquire into the wisdom of the policy pursued by the Government, pursuant to which the acts of August 15, 1876, and February 28, 1877,. were enacted, and the adequacy of the consideration assumed and paid by defendant for the property acquired under those acts. Section 1 of the jurisdictional act (41 Stat. 738) authorizes this court to adjudicate “legal and equitable” claims and to determine the amount, “if any, due said tribe from the United States” upon such legal ,and equitable claims “under any treaties, agreements, or laws of Congress,, or for the misappropriation of any of the funds or lands of said tribe.”
The facts summarized show that by article 2 of the treaty of April 29, 1868, with plaintiff tribe, the Black Hills section of South Dakota here involved, and comprising about 7,345,167 acres, was included in the area set apart for the absolute and undisturbed use and occupation of the tribe, and, in addition, certain hunting privileges were granted by articles 11, 15, and 16 with reference to other lands. Under this treaty the Government assumed an obligation, among; others, to provide food for the subsistence of all the Indians, of the tribe for a period of four years. The population of' the tribe was between twenty and thirty thousand. This obligation was fulfilled through the necessary appropriations *659 annually for tlie term stipulated and was finally discharged by the appropriation of $1,314,000 on February 14, 1873, for subsistence for the year ending June 30, 1874, — the total amount appropriated for the four years being $5,295,761.95. After that no legal obligation rested upon the Government to expend public funds for subsistence of the tribe. The Indians were at that time incapable of supporting themselves.
It was known by the Indians that the Black Hills portion of the reservation contained some gold before and at the time the treaty of 1868 was made, but it was not known or believed by the Government that this area contained gold in paying quantities. The fact that the Black Hills contained gold was not known to the-general public until after the results of the Custer Exploration Expedition into the Black Hills in the summer of 1874 had been published. Immediately thereafter there was a tide of emigration of settlers and miners to the Black Hills region in ever-increasing numbers. The Government, through the President and the military department, made serious efforts to prevent the intrusion and to expel the intruders, but these efforts were only partially successful. Public pressure for the opening of the Black Hills for settlement and minings became very strong. The situation in 1875 was such that the Government believed serious conflicts would develop between the settlers and the Government, and between the settlers and the Indians. - In May 1875 a delegation of Sioux Indians was called to Washington for a preliminary discussion with the President, the Secretary of tlm Interior, and the Commissioner of Indian Affairs looking to the cession or sale by the Sioux Tribe to the United States of the hunting rights outside the permanent reservation and the sale of the Black Hills portion of their reservation, (see finding 6). Later, a commission was appointed by the President, June' 18, 1875, to continue negotiations in the Sioux country, but it was unsuccessful in its efforts to negotiate terms for cession of the hunting fights and the Black Hills area to the Government and its mission failed. A full report was made to the President. In December 1875 the President, in his-annual message to Congress, recommended that because of *660 an anticipated large increase in emigration to the Black Hills, and the difficulties of the Government in that connection, the Congress should adopt some measure to relieve the embarrassment growing out of the causes mentioned, and the attention of Congress was brought to the fact that the last two annual appropriations for the fiscal years 1875 and 1876 (which amounted to $2,350,000) for the subsistence of the Indians of the Sioux Tribe had been made gratuitously, the treaty obligation having been discharged by the appropriation made in 1873 for the fiscal year 1874.
At that time the Government was having and continued, through 1876 and 1877, to have trouble with certain of the Sioux Indians, particularly Sitting Bull and Crazy,Horse and their bands numbering about sixty lodges and approximately six hundred warriors, in connection with the survey and construction of the Northern Pacific Railroad through the hunting grounds of, the tribe, and raids by those bands on white settlers and other Indians. On this account war between the Government and these bands and other unfriendly Sioux Indians developed in March 1876 and ended September 10, 1877, with heavy loss to both the Government and the Indians. This trouble and the military engagements between the Government and certain bands of the Indians from 1873 to 1877, inclusive, had no direct connection with the Black Hills matter.
In the act of August 15, 1876, making appropriations for the Indian Department for the year ending June 30, 1877, Congress, with full knowledge of the existing conditions, made a further appropriation of $1,000,000 for the subsistence and civilization of the Sioux Indians and provided therein that no part of that appropriation could be used, and that, thereafter, no appropriation for that purpose would be made, unless the Indians should relinquish all right and claim to hunt and roam on any country outside of the boundary of the permanent reservation and release to the Government so much of their permanent reservation as lay west of the 103rd meridian of longitude, which was the Black Hills area, and should also grant rights-of-way over the reservation to the country thus ceded for wagon or other roads from convenient and accessible points on the Missouri River. This act also appropriated an additional *661 amount of $200,000 to be expended by the President in carrying out those provisions. The President promptly appointed a commission to negotiate with the Sioux Tribe for the relinquishments, cessions, and stipulations required by the act. This commission proceeded to the Sioux country and negotiated and counseled with the chiefs, headmen, and the Indians at the various agencies within the reservation for their assent to an agreement of sale to the Government embodying the terms and conditions of the act of Congress, both of which were duly explained and interpreted to the Indians, and every effort was made to secure, in conformity with article 12 of the treaty of 1868, the assent and signatures of three-fourths of the male adult Indians of the tribe to the agreement. In this the commission was unsuccessful. The male adults constituted about 25 percent of the entire population of the tribe. As shown in the findings, more than 90 percent of the male adult Indians of the tribe refused to agree to sell the Black Hills and the hunting rights to the Government at any price; a small portion of the Indians expressed a willingness to lease only the mining rights in the Black Hills to the Government for $70,000,000 or subsistence for all members of the tribe so long as the tribe existed. Finally, the commission was able to obtain the assent and signature to the agreement of less than 10 percent of the male adult members of the tribe. The record of the negotiations between the commission and the Indians, which was laid before the President and the Congress, shows that anything more than what the commission accomplished was impossible through negotiations. The chiefs and headmen of the tribe assented to the terms of the act of 1876 and the provisions of the agreement which embodied them. The agreement, to the extent consummated by the commission, was transmitted by the commission to the President with the journal and minutes of the commission, and they were, in turn, transmitted to Congress by the President for action. In due course the Congress embodied the agreement, so transmitted, in an act of both Houses, which act contained, among others, the requirements of the act of August 15, 1876. This action was taken pursuant to the provisions of section 4 of the act of 1871, 16 Stat. 566, R. S. 2079 — Lone Wolf v. Hitch *662 cock, 187 U. S. 558, 556; Choctaw Nation v. United States, 119 U. S. 1, 27. It was approved, by the President on February 28, 1877 (19 Stat. 254). The provisions of this act of 1877 have been in every respect fulfilled by the Government. Article 5 of the “Agreement” made the act of Congress provided that “Such rations [for subsistence of the Indians of the Sioux Tribe], or so much thereof as may be necessary, shall be continued until the Indians are able to support themselves.”
In addition to the total of $3,055,450 appropriated and disbursed for subsistence of the Indians for the fiscal years 1874 to 1876, the Government, under and pursuant to the provisions of the act of February 28, 1877, has appropriated and disbursed for the subsistence of the Sioux Indians a total of more than $39,000,000 to June 30, 1926. Additional appropriations subsequently made for the same purpose have brought the total to approximately $43,000,000— (finding 19). In addition to these appropriations, the act of 1877 gave the Indians about 900,000 additional acres of grazing lands.
Subsequently, by the act of March 2, 1889, Congress directed that the Great Sioux Reservation, as it then existed, be divided into separate reservations of stated metes and bounds and that the land within the reservation outside the limits of the delimited permanent reservation should be sold for the benefit of the Indians in the manner provided in that act. Section 19 of this act also provided that all the provisions of the treaty of 1868 and the agreement signed by certain of the Indians in September 1876 not in conflict with the act should be continued in force according to their tenor and limitation. By section 28 thereof it was provided that the act should become effective only upon acceptance by the Indians as provided in article 12 of the treaty of 1868, that is, by not less than three-fourths of the male adult Indians. The act was submitted to and duly accepted by the Indians and such acceptance was proclaimed by the President. See Choctaw Nation v. United States, supra, page 29.
Sections 1 and 2 of the jurisdictional act, 41 Stat. 738, under which this suit was instituted, and within the terms *663 of which the claim presented must be decided, are as follows:
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That all claims of whatsoever nature which the Sioux Tribe of Indians may have against the United States, which have not heretofore been determined by the Court of Claims, may be submitted to the Court of Claims with the right of appeal to the Supreme Court of the United States by either party, for determination of the amount, if any, due said tribe from the United States under any treaties, agreements, or laws of Congress, or for the misappropriation of any of the funds or lands of said tribe or band or bands thereof, or for the failure of the United States to pay said tribe any money, or other property due; and jurisdiction is hereby conferred upon the Court of Claims, with the right of either party to appeal to the Supreme Court of the United States, to hear and determine all legal and equitable claims, if any, of said tribe against the United States, and to enter judgment thereon.
Sec. 2. That if any claim or claims be submitted to said courts they shall settle the rights therein, both legal and equitable, of each and all the parties thereto, notwithstanding lapse of time or statutes of limitation, and any payment which may have been made upon any claim so submitted shall not be pleaded as an estoppel, but may be pleaded as an offset in such suits or actions, and the United States shall be allowed credit for all sums heretofore paid or expended for the benefit of said tribe or any band thereof. The claim or claims of the tribe or band or bands thereof may be presented separately or jointly by petition, subject, however, to amendment, suit to be filed within five years after the passage of this Act; * * *.
At the outset it should be stated that the jurisdiction of the court must be found within the terms of the jurisdictional act. Tillson v. United States, 100 U. S. 43; United States v. Choctaw Nation and Chickasaw Nation, 179 U. S. 494, 534, 535. The act merely provides a forum for the adjudication of the claim according to applicable legal principles. In Price v. United States and Osage Indians, 174 U. S. 373, 375, the court said :
The right of the plaintiff to recover is a purely statutory right. The jurisdiction of the Court of *664 Claims cannot be enlarged by implication. It matters not what may seem to this court equitable, or what obligation we may deem ought to be assumed by the Government,. or the Indian tribe, whose members were guilty of this depredation, we cannot go beyond the language of the statute and impose a’ liability which the Government has not declared its willingness to assume. It is useless to cite all the authorities, for they are many, upon the proposition. It is an axiom of our jurisprudence. The Government is not liable to suit unless it consents thereto, and its liability in suit cannot be extended beyond the plain language of the statute authorizing it. See, among other cases, Schillinger v. United States, 155 U. S. 163, 166, in which this court said: “The United States cannot be sued in their courts without their consent, and in granting such consent Congress has an absolute discretion to specify the cases and contingencies in which the liability of the government is submitted to the courts for judicial determination. Beyond the letter of such consent the courts may not go, no matter how beneficial they may deem or in fact might be their possession of a larger jurisdiction over the liabilities of the government.”
In United States v. Mille Lac Band of Chippewa Indians in the State of Minnesota, 229 U. S. 498, 500, the court said:
The jurisdictional act makes no admission of liability, or of any ground of liability, on the part of the Government, but merely provides a forum for the adjudication of the claim according to applicable legal principles. Nor does it contemplate that recovery may be founded upon any merely moral obligation, not expressed in pertinent treaties or statutes, or upon any interpretation of either that fails to give effect to their plain import, because of any supposed injustice to the Indians.
Suit may not be maintained against the United States in any case on a claim not clearly within the terms of the statute by which it consents to be sued. United States v. Michel, 282 U. S. 556, 659. Special jurisdictional acts are strictly construed and clear grant of authority must be found in the act. Blackfeather v. United Stales, 190 U. S. 368, 373-376. United States v. Goltra, 312 U. S. 203, 210, 211; United States v. Shaw, 309 U. S. 495, 500, 501. Only where consent “to suit” without qualification has been given *665 in respect of suits against Government owned or controlled ^corporations has the act granting the consent been liberally construed — Keifer & Keifer v. Reconstruction Finance Co., et al., 306 U. S. 381, 387, 396. “If Congress has been •accustomed [in the enactment of special jurisdictional acts] to use a certain phrase with a more limited meaning than might be attributed to it by .common practice, it would be arbitrary to refusei to consider that fact when we come to interpret a statute. But * * * the usage of Congress simply shows that it has spoken with careful precision, that its words mark the exact spot at which it stops.” Boston Sand and Gravel Company v. United States, 278 U. S. 41, 48. The sovereignty of the United States raises a presumption against its suability, unless it is clearly shown. The court may not enlarge its liability beyond what the language of the act requires. Eastern Transportation Co. v. United States, 272 U. S. 675, 686; Blair v. City of Chicago, 201 U. S. 401, 470-473; Bridge Company v. United States, 105 U. S. 470, 480-484. When Congress has desired to open up claims, as a result of its action taken pursuant to a policy deemed to be for the welfare of the Indians, for consideration and adjudication de novo it has used language clearly indicating that purpose. Choctaw Nation v. United States, 119 U. S. 1, 2, 36-31, 35. Assiniboine Indian Tribe v. United States, 77 C. Cls. 347, 348-350. While, in proper cases, the rules of law which apply to the Government are, with a few exceptions growing out of public policy, the same as those which apply to individuals, public policy demands that the Government in its dealings with individuals should occupy an apparently favored position and consequently the equities which arise as between individuals have, in the absence of waiver by Congress, but a limited application as between the Government and a citizen. United States v. Verdier, 164 U. S. 213, 218, 219.
The reason for the rule of strict construction as announced in the above-cited cases is that “it serves to defeat any purpose concealed by the skillful use of terms, to accomplish something not apparent on the face of the act, and thus sanctions only open dealing with legislative bodies.” Slidell v. Grandjean, 111 U. S. 412, 438.
*666 In the case at bar the jurisdictional act, except so far as concerned the competencj^ of the Indian tribe to sue and the limitation on our general jurisdiction under section 259, title 28, U. S. C., as well as the statute of limitation, created no new right or claim in favor of the tribe not otherwise within the limitations of our general jurisdiction. Green v. Menominee Tribe, 233 U. S. 558, 570, 571. Whitney v. Robertson, 124 U. S. 190, 194, 195. It is a warrant of authority to adjudicate legal results, and not to determine the propriety or reasonableness of the means employed by Congress unless it appears that the action taken by the means adopted violated substantive rights of the Indians and that liability of the Government for a money judgment was a legal incident of the action taken by Congress. Compare Mille Lac Chippewas v. United States, 46 C. Cls. 424, 455.
A study of the facts and circumstances of this case, the provisions of article 12 of the treaty of 1868, the acts of Congress of August 15,1876, and February 28,1877, and the application thereof to the provisions of the jurisdictional act in the light of the established principles governing the rights and privileges of the Indians and the power and authority of the Government in their dealings with each other-leads us to the conclusion that as a matter of law the plaintiff tribe is not entitled to recover from the United States as for a “taking” or “for the misappropriation of any lands of said tribe.”
Except for the fact that in this case Congress passed a special jurisdictional act providing a forum to which the tribe might present for adjudication any legal or equitable claim which it might have against the United States under and legally supported by any treaty, agreement, or law of Congress, the case at bar is almost identical on its facts and the treaty and statutory provisions with the case of Lone Wolf v. Hitchcock, 187 U. S. 553. In that case, as here, the Government was unable to obtain the consent of three-fourths of the male adult Indians of the tribe to an agreement which the Congress, over the protest of the Indians and with the knowledge that it had not been assented to by the required three-fourths, embodied in an act of Congress notwithstanding the provisions of article 12 of the *667 treaty. The acts in both cases were subsequently carried out by the Government.
In the case at bar the claim made by plaintiff for compensation- as for a taking of its land and hunting rights is fundamentally predicated upon the provisions of articles 2 and 12 of the treaty of 1868. This claim is attempted to be sustained on the sole ground that the action of Congress, with the approval of the President, in requiring the tribe to give up a portion of its reservation and hunting rights to the Government was not in conformity with the provisions of article 12 of the treaty of 1868 with reference to the consent of three-fourths of the tribe to a cession. This is necessarily the sole ground upon which the claim could be made because there was no law of Congress relating to this claim granting plaintiff any rights which have not been faithfully fulfilled. The act of 1877 is not a law supporting the claim because everything that act promised has been given, and also because that statute was the act of the Government which gave rise to a claim of plaintiff, if it has one, under the treaty of 1868.
In the Shoshone and Oreeh cases, supra, cited and relied on by plaintiff, there was, on the facts disclosed, an arbitrary taking by the Government without payment or the assumption of an obligation to pay any compensation, and it was held that the lands of the Indians had been taken for a public purpose and under such circumstances as to give rise to an implied obligation under the Fifth Amend- , ment to pay just compensation therefor. In the case at bar, the Congress, in an act enacted because of the situation encountered and pursuant to a policy which in its wisdom it deemed to be in the interest and for the benefit and welfare of the Indians of the Sioux Tribe, as well as for the necessities of the Government, required the Indians to sell or surrender to the Government a portion of their land and hunting rights on other land in return for that which the Congress, in its judgment, deemed to be adequate consideration for what the Indians were required to give up, which consideration the Government was not otherwise under any legal obligation to pay. There is, therefore, no room for the conclusion that under the act of 1877 Congress impliedly *668 promised to pay more than what was specified therein. Baker v. Haney, 181 U. S. 481, 492; Blackfeather v. United States, 190 U. S. 368, 373.
In other cases hereinafter mentioned the Indians were required against their will and consent to relinquish to the Goveriiment portions of their reservations for sale or disposition for their benefit, and these acts were sustained as being clearly within the authority of Congress to legislate with reference to control and disposition of Indian property.
As we shall hereinafter attempt to show, we think there is no difference in principle insofar as any legal claim of the plaintiff is concerned between the power or authority of Congress to do what it did in this case and our authority to pass upon the justness and fairness of what it did, and what was done in other cases without the consent of the Indians and contrary to the provisions of treaty stipulations. In other words, if in the case at bar Congress had the authority legally to do what it did, and if the action taken and the results of that action were pursuant to and based upon what- Congress deemed in the circumstances to be for the interest of the Indians, as the facts clearly show was the case, the Indians have no legal right to complain, or to maintain under the terms of the jurisdictional act a claim for more money, plus the addition of interest from 1877, in addition to the amount which Congress stipulated should be paid and which has been and is being paid, and will continue to be paid until the Indians, with the assistance of the Government, become self-supporting. Congress possessed the authority to take the action of which the plaintiff complains, and since the record .shows that the action taken was pursuant to a policy which the Congress deemed to be for the interest of the Indians and just to both parties there was no misappropriation of the land by the Government and the court may not go back of the acts of 1876 and 1877 and inquire into the motive which prompted the enactment of this legislation or the wisdom thereof.
There was inherent in the treaty of 1868, as one of the necessarily.implied conditions thereof, the undeniable right of Congress, if it deemed the interests of the Indians as well as those of the Government and the existing circumstances *669 dictated or required, to legislate under the act of 1871 in whatever way it might choose with reference to the management and control of the property and affairs of the Indians, even though such action should be in conflict with some treaty provision and against the desire of the Indians. “The power of the general government over these remnants of a race once powerful, * * * is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else, because the theatre of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes.” United States v. Kagama, 118 U. S. 375, 383. Lone Wolf v. Hitchcock, supra, p. 567. This was expressly recognized and stated by the court in Choate v. Trapp, 224 U. S. 665, in which, at pp. 670 and 671, the court said:
There are many cases, some of which are cited in the opinion of the Supreme Court of Oklahoma (Thomas v. Gay, 169 U. S. 264, 271; Lone Wolf v. Hitchcock, 187 U. S. 553, 565), recognizing that the plenary power of Congress oyer the Indian- Tribes and tribal property cannot be limited by treaties so as to prevent repeal or amendment by a later, statute. The Tribes have been regarded as dependent nations, and treaties with them have been looked upon not as contracts, but as public laws which could be abrogated at the will of the United States.
This sovereign and plenary power was exercised and retained in all the dealings and legislation under which the lands of the Choctaws and Chickasaws were divided in severalty among the members of the Tribes. For, although the Atoka Agreement is in the form of a contract it is still an integral part of the Curtis Act, and, if not a treaty, is a public law relating to tribal property, and as such was amendable and repealable at the will of Congress. But there is a broad distinction between tribal property and private property, and between the power to abrogate a statute and the authority to destroy rights acquired under such law. Reichert v. Felps, 6 Wall. 160. The question in this case, therefore, is not whether the plaintiffs were parties to the Atoka Agreement, but whether they had not acquired rights under the Curtis Act which are now protected by the Constitution of the United States.
*670 In essence, therefore, the present claim is moral, rather than legal, and before we can adjudicate and render judgment upon it, we must have from Congress clear authority to do so, which authority, we think, under the rule announced in the Price and Osage cases, and other cases cited, supra, was not conferred by the jurisdictional act. We must presume in the circumstances of this case that Congress acted in good faith.
An inherent weakness in plaintiff’s position and argument is the assumption that in every case and under every circumstance, insofar as the right of the Government to require or compel the Indians to dispose o.f their property is concerned, the Indians and the Government stand on an equality with respect to the authority of either to act without incurring legal liability when a treaty exists.
The case of Lone Wolf v. Hitchcock, 187 U. S. 553, involved a treaty of 1867 with the Kiowa and Comanche Tribes of Indians which set apart a reservation of land for their absolute use and occupation with a stipulation that no treaty for the cession of any portion or part of the reservation “shall be of any validity or force as against the said Indians, unless executed and signed by at least three-fourths of all the adult male Indians occupying the same.” An act of Congress of June 6, 1900, embodied a so-called agreement for cession of certain land to the Government for allotment in severalty to which the Government had been unable to obtain the assent of the required three-fourths of the male adult Indians of the tribe. To that extent the “agreement” and the act of Congress were in conflict with article 12 of the treaty. When the proposed agreement was submitted to the Indians by the commission appointed for that purpose, they objected to the same and refused to assent to it, and only a portion, less than three-fourths, signed it. When it was submitted to Congress the Indian Tribe protested against it to Congress, insisting that they had not consented to it as required by the treaty and that it was in conflict with the express provisions of the treaty. Notwithstanding this, the instrument was made the terms of an act of Congress pursuant to a policy deemed by Congress to be for the benefit of and in *671 the interest of the Indians and the Government. Lone Wolf, who was joined by the members of the tribes, brought a suit in equity to enjoin the Secretary of Interior from carrying out the provisions of the act on the ground, among others, that it violated the property rights of the Indians under their treaty.
While it is true, in that case, the cession to the Government enforced by the act of 1900 was the surrender of lands for allotment to the Indians in severalty rather than a forced sale to or acquisition by the Government, as in the case at bar, nevertheless the court considered and announced certain principles with reference to the authority of Congress from considerations of necessity or policy to legislate contrary to treaty stipulations and with reference to the extent to which the court might inquire into the wisdom of the policy as being in the interest of the Indians. The court held, at p. 564, that “To uphold the claim would be to adjudge that the indirect operation of the treaty was to materially limit and qualify the controlling authority of Congress in respect to the care and protection of the Indians, and to deprive Congress, in a possible emergency, when the necessity might be urgent for a partition and disposal of the tribal lands, of all power to act, if the assent of the Indians could not be obtained.” And, at p. 564 and 565, the court said: “Now, it is true that in decisions of this court, the Indian right of occupancy of tribal lands, whether declared in a treaty or otherwise created, has been stated to be sacred, or, as sometimes expressed, as sacred as the fee of the United States in the same lands. Johnson v. McIntosh, (1823) 8 Wheat. 543, 574; Cherokee Nation v. Georgia, (1831) 5 Pet. 1, 48; Worcester v. Georgia, (1832) 6 Pet. 515, 581; United States v. Cook, (1873) 19 Wall. 591, 592; Lemenworth &c R. R. Co. v. United States, (1875) 92 U. S. 733, 755; Beecher v. Wetherby, (1877) 95 U. S. 517, 525. But in none of these cases was there involved a controversy between Indians and the Government respecting the power of Congress to administer the property of the Indians. The questions considered in the cases referred to, which either directly or indirectly had relation to the nature of the property rights of the Indians, *672 concerned the character and extent of such rights as respected States or individuals. In one of the cited cases it was clearly pointed out that Congress possessed a paramount power over the property of the Indians, by reason of its exercise of guardianship over their interests, and' that such authority might be implied, even though opposed’ to the strict letter of a treaty with the Indians. Thus, in Beecher v. Wetherby, 96 U. S. 617, discussing the claim that there had been a prior reservation of land by treaty to the use of a certain tribe of Indians, the court said (p. 525) : ‘But the right which the Indians held was only that of occupancy. The fee was in- the United States, subject to that right, and could be transferred by them whenever they chose. The grantee, it is true, would take only-the naked fee, and could not disturb the occupancy of the-Indians; that occupancy could only be interfered with or-determined by the United States. It is to be presumed that in this matter the United States would be governed by such considerations of justice as would control a Christian people in their treatment of an ignorant and dependent race. Be that as it may, the propriety or justice of their-action towards the Indians with respect to their lands is a question of governmental policy, and is not a matter open-to discussion in a controversy between third parties, neither-of whom derives title from the Indians.’” The court, at page 565, further stated that “Plenary authority over the-tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been-deemed a political one, not subject to be controlled by the judicial department of the Government. Until the year 1871 [act of March 3, 1871, 16 Stat. 544] the policy was; pursued of dealing with the Indian tribes by means of treaties, and, of course, a moral obligation rested upon-Congress to act in good faith in performing the stipulations, entered into on its behalf. But, as with treaties made with foreign nations, Chinese Exclusion Case, 130 U. S. 581, 600, the legislative power might pass laws in conflict with treaties made with the Indians.” And the court said further, at page 566, that “The power exists to abrogate the provisions, of an Indian treaty, though presumably such power will be- *673 exercised only when circumstances arise which will not only justify the Government in disregarding the stipulations of the treaty, but may demand, in the interest of the country hnd the Indians themselves, that it should do so. When, therefore, treaties were entered into between the United States and a tribe of Indians it was never doubted that the poioer to abrogate existed in Congress, and that in a contingency such power might be availed of from considerations of governmental policy, particularly if consistent with perfect good faith towards the Indians.”
And, finally, at p. 568, the court said:
We must presume that Congress acted in perfect good faith in the dealings with the Indians of which complaint is made, and that the legislative branch of the Government exercised its best judgment in the premises. In any event, as Congress possessed full power in the matter, the judiciary cannot question or inquire into the motives which prompted the enactment of this legislation. If injury was occasioned, which we do not wish to be understood as implying, by the use made by Congress of its power, relief must be sought by an appeal to that body for redress and not to the courts.
We think the principles thus announced by the court in the Lone Wolf case are applicable here under the facts and circumstances in this case and that the decisions in Shoshone Tribe of Indians v. United States, 299 U. S. 476, 304 U. S. 111, upon which plaintiff relies, and other similar cases hereinafter discussed, are distinguishable for the reason that in those cases Congress exercised an arbitrary power, either directly or by ratification, which deprived the Indians of their property without rendering, or assuming an obligation to render, compensation therefor. The claims involved in the Greek and Shoshone cases were clearly and unquestionably legal claims. Compare Chippewa Indians of Minnesota v. United States, 91 C. Cls. 97.
Subsequent to the opinion in the Lone, Wolf case, a number of cases have been decided in which the principles announced in that case have been recognized and which announce the additional principle, which has now become well-established in cases brought under special jurisdictional acts, that the United State cannot, through Congress or *674 otherwise, arbitrarily deprive the Indians of their lands or monies secured to them by a treaty or law of Congress, or to appropriate the lands of Indian tribes to its own purposes or give them to others without rendering or assuming an obligation to render just compensation therefor. In United States v. Greek Nation, 295 U. S. 103, the tribe brought suit in this court under a jurisdictional act to recover compensation for certain lands of its reservation of which it had been deprived, without its consent, and for which it had not been paid. The court, at page 108, said:
Counsel for the government, assuming that the present claim is merely for damages arising out of errors on the part of administrative officers, contend that it does not come within the terms of the jurisdictional act— “any and all legal and equitable claims arising under or growing out of any treaty or agreement between the United States and the Creek Indian Nation or Tribe, or arising under or growing out of any Act of Congress in relation to Indian affairs, which said Creek Nation or Tribe may have against the United States.” We think the contention is not tenable.
Counsel’s assumption ignores several elements of the claim, such as the treaties of 1833 and 1866 and the acts of Congress of 1889 and 1891. It also neglects matters reflecting a confirmation of the acts of the administrative officers, such as the receipt by the United States of direct and material benefits from their acts and its retention of the benefits with knowledge of all the facts.
While the jurisdictional act is couched in general terms, there can be little doubt when it is read in the light of the circumstances leading to its passage that it is intended to include the present claim. The congressional committees on whose recommendation the act was passed were in possession of all data bearing on the claim. The facts .had been laid before them in letters from the Secretary of the Interior, the Commissioner of Indian Affairs and the Commissioner of the General Land Office. * * * In view - of this portraval of the matter by the officers specially charged with the administration of Indian and public-land affairs, and the subsequent action of the committees in effecting the passage of the jurisdictional act, we regard it as reasonably manifest that the act is intended to provide for the adjudication of the present claim. The conces *675 sions made in the court below by those who were there representing the Government show rather plainly that they so understood the a,ct.
The court, in discussing the question whether there had been a taking and the liability of the United States in connection therewith under the facts disclosed, at pages 109-111, said:
A question is raised as to whether there was an appropriation or taking of the lands by the United States.
The Creek tribe had a fee simple title, not the usual Indian right of occupancy with the fee in the United States. That title was acquired and held under treaties, in one of which the United States guaranteed to the tribe quiet possession. The tribe was a dependent Indian community under the guardianship of the United States, and therefore its property and affairs were subject to the control and management of that government. But this power to control and manage was not absolute. While extending to all appropriate measures for protecting and advancing the tribe, it was subject to limitations inhering in such a guardianship and to pertinent constitutional restrictions. It did not enable the United States to give the tribal lands to others, or to appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation for them; for that “ would not be an exercise of guardianship, but an act of confiscation.” Lane v. Pueblo of Santa Rosa, 249 U. S. 110, 113; Cherokee Nation v. Hitchcock, 187 U. S. 294, 307-808.
Such was the situation when the lands in question were disposed of under the act of 1891. The disposals were made on behalf of the United States by officers to whom it had committed the administration of that act, and were consummated by the issue of patents signed by the President. [Italics ours.]
$ $ ‡ $
We conclude that the lands were appropriated by the United States in circumstances which involved an implied undertaking by it to make just compensation to the tribe.
The case of Klamath and Moadoc Tribes of Indians et al. v. United States, 296 U. S. 244, involved a question of law as to the right of the Indians to recover because they had executed a release in connection with a payment which the *676 Government had made for certain land, of which they had originally been deprived without their consent under an act of Congress in 1906, but the opinion of the court, in certain aspects, is pertinent here. In that case the Indians claimed that they were entitled to maintain suit to recover just compensation for 87,000 acres of land on the ground (1) that they had been deprived of this land contrary to the provisions of a treaty and without their knowledge or consent (which was true) ; (2) that it was a legal and equitable claim within the meaning of the language of section 1 of the jurisdictional act; (3) that the consideration of $108,750 paid by the government therefor, pursuant to an act of Congress of 1908, was wholly inadequate (which was true); and (4) that they were not barred because of a release from recovering just compensation for the land by reason of a provision in section 2 of the jurisdictional act, which provided that any payment which had been made on any claim submitted to the court should not be pleaded as an estoppel but might be pleaded as an offset. This court had found that the fair value of the 87,000 acres of land, when taken in 1906, .was $2,980,000. Interpreting section 1 of the jurisdictional act, the Supreme Court (p. 250) said:
The meaning of the general language of section 1 that “all claims of whatsoever nature” which plaintiffs have against the United States “may be submitted” is limited by the clause “which have not heretofore been determined by the Court of Claims,” and is further much narrowed by the definitions of the classes of claims meant to be included. And correspondingly restrained is the meaning of the phrase “all legal and equitable claims” in the clause conferring jurisdiction upon the court “to hear and determine.” Thus the privilege of plaintiffs to submit and the power of the court to determine are made coextensive. The Act grants a special privilege to plaintiffs and is to be strictly construed and may not by implication be extended to cases not plainly within its terms. Schillinger v. United States, 155 U. S. 163, 166. Price v. United States and Osage Indians, 174 U. S. 373, 375. Blackfeather v. United States, 190 U. S. 368, 376.
This claim is plainly not, within the meaning of section 1, for an amount due under treaty, agreement or law of Congress or for misappropriation of funds of the Indians. * * '*. ’
*677 The court further said, at pp, 251, 252:
Plaintiffs turn for support to the provision of section 2 which prevents “payment * * * upon any claim” from being pleaded as an estoppel but permits it to be asserted as- an offset. And they insist that, if this clause does not relate to payments made and accepted as being in full, it means nothing. But that contention is based on a misunderstanding of the language used. Payment upon a claim means payment on account or in part as distinguished from one made' and accepted as payment in full. The quoted provision made no grant of jurisdiction; it was inserted merely to eliminate defenses. Neither it nor any other part of section 2 may be held to add claims to those covered by the language of section 1. As jurisdiction will not be extended beyond the terms of the Act by any implication or other resort to construction, no force can be given to plaintiffs’ suggestion that intention to include claims already settled and released is shown by the clause in section 2 allowing defendant credit for money it expended for plaintiffs.
In connection with the question whether the tribes had shown the release invalid, the court, at p. 252, said:
_ The question is not whether under the circumstances disclosed the United States may set up the release as a defense. It is whether the special Act brings the claim within the court’s jurisdiction. * * * It is to be remembered that the Act of April 30, 1908, was passed by Congress in the exertion of its untrammeled power in behalf of the United States to fix, as it deems appropriate and just under the circumstances, the amount of compensation to be paid the Indians for the rights of the plaintiffs lost by the taking of the 87,000 acres from their reservation. Cherokee Nation v. Hitchcock, 187 U. S. 294, 306, 308. Lone Wolf v. Hitchcock, 187 U. S. 553, 565-566. Choate v. Trapp, 224 U. S. 665, 670-671. Cf. United States v. Mille Lac Chippewas, 229 U. S. 498, 506, 509-510. United States v. Greek Nation, supra, 110.
Finally, with reference to the inadequacy of the, amount paid by the government for the lands which had been taken and the relationship between the Government and the Indians, the court, at p. 254, said:
Plaintiffs say that the plain inadequacy of the payment, when taken in connection with the unequal posi *678 tions of the parties, is enough without more to invalidate the release. The findings show that the amount paid plaintiffs was less than four percent of the value of the land. It was grossly inadequate. Where, in litigation between private parties, a release of claim is by the party who gave it challenged as invalid, inadequacy of consideration coupled with lack of business capacity and inferiority of position in respect of the transaction or in relation to that of the other party are elements having significance. Wheeler v. Smith, 9 How. 55, 82. Thorn Wire Co. v. Washburn & Moen Co., 159 U. S. 423, 443. But the rules that govern in such cases have no application in suits by these Indian tribes against the United States.- The relation between them is different from that existing between individuals whether dealing at arm’s length, as trustees and beneficiaries, or otherwise. See Choctaw Nation v. United, States, 119 U. S. 1, 28. Lone Wolf v. Hitchcock, ubi, sufra. Choate v. Trapp, ubi, supra. Regard being had to the nature of duties, resembling those arising out of the relation of guardian and ward, owed by the United States to Indian tribes, and in view of the undoubted power of Congress to determine the amount and to fix the terms of payment of compensation for -the rights lost to plaintiffs, it is clear that in the absence of specific authorization, they may not avoid the release given in accordance with the Act upon the ground that the payment was too small. That would enable them to question the laws of Congress in fields where because of the relationship referred to, they are supreme.
The obligation of the United States to make good plaintiffs’ loss is a moral one calling for action by Congress in accordance with what it shall determine to be right. Save to the extent that Congress may authorize, the Government’s dealings with Indian tribes are not subject to judicial review. Lone Wolf v. Hitchcock, 187 U. S. 553, 567-568.
Subsequently, in 1936, Congress passed an additional jurisdictional act in the Klamath case authorizing the court to enter judgment upon the findings of fact theretofore made with the provision that any payment theretofore made to the Indians in connection with any release of settlement should be charged as an offset but should not be treated as an estoppel, and this court entered judgment on the basis of a value of $2,980,000, less the payment made and other *679 allowable offsets, which judgment, with the addition of interest from 1906, as a part of just compensation, amounted to $5,313,347.32. 85 C. Cls. 451; affirmed 304 U. S. 119.
The case of Shoshone Tribe of Indians v. United States, 299 U. S. 476, and United States v. Shoshone Tribe of Indians, 304 U. S. 111, on which plaintiff places chief reliance in support of its claim, was a case where the Government officials in 1878 arbitrarily took certain lands or rights therein of the Shoshone Indians for the benefit of another tribe without the consent, then or later, of the Shoshone Indians and, therefore, contrary to and in violation of the provisions of articles 2 and 12 of the treaty, and this action was subsequently ratified by Congress by an act ratifying an agreement of cession in connection with which the Shoshones ivere required to permit the Arapahoes. to participate, and in the proceeds of which the Arapahoes were to share equally. In that case there was no acquisition of land by the Government from the Indians for a consideration deemed adequate, nor was there an acquisition in connection with or in pursuance of a policy or the exercise of a power deemed by Congress to be for the interest or welfare of the Indians, as well as the Government. In that case the Government did not undertake to render, or assume an obligation (except under the Fifth Amendment) to render compensation for the land of which the Shoshone Indians were deprived, or the money from the reservation of which they would be deprived by reason of the action taken. The land was therefore taken or misappropriated under the treaty and the Shoshone Indians had a legal claim for compensation therefor. In the first decision, 299 U. S. 476, 496, 497, the court held that there had been a taking of property of the Shoshone Tribe under the power of eminent domain and that “The fact is unimportant that the taking was tortious in its origin, if it was made lawful by relation” (United States v. Goltra et al., 312 U. S. 203, 208, 209), and “The fact also is unimportant that it was a partial taking only, and that eviction was not complete”, and that “Finally the fact is unimportant, there having been an appropriation of property within the meaning of the Fifth Amendment, that *680 the jurisdictional act is silent as to an award of interest or any substitute therefor. * * * Given süch a taking, the right to interest or a fair equivalent, attaches itself automatically to the right to an award of damages.” Finally the court, recognizing the rule of the undoubted authority of Congress, which cannot be questioned in a legal proceeding, to deal with tribal property of the Indians in whatever way it deems to .be for the best interests and welfare of the Indians, as well as of the Government, -said:
Nor does the nature of the right divested avail to modify the rule. Power to control and manage the property and affairs of Indians in good faith for their betterment and welfare may be exerted in many ways and at times even in derogation of the provisions of a treaty. Lone Wolf v. Hitchcock, 187 U. S. 553, 564, 565, 566. The power does not extend so far as to enable the Government “to give the tribal lands to others, or to appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation * * *; for that ‘would not be an exercise of guardianship, but an act of confiscation.’ ” United States v. Creek Nation, supra, [295 U. S. 103] p. 110; citing Lane v. Pueblo of Santa Rosa, 249 U. S. 110, 113 Cherokee Nation v. Hitchcock, 187 U. S. 294, 307-308. The right of the Indians to the occupancy of the lands pledged to them, may be one of occupancy only, but it is “as sacred as that of the United States to the fee.” United States v. Cook, supra, p. 593; Lone Wolf v. Hitchcock, supra; Choate v. Trapp, 224 U. S. 665, 671; Yankton Sioux Tribe v. United States, supra. Spoliation is not management.
In the case of Chippewa Indians of Minnesota v. United States, 88 C. Cls. 1, the Indians sued to recover interest on a trust fund, which fund and interest was provided for under an agreement between the Indians and the Government, but which fund was, before the expiration of the period stipulated in the agreement, expended and disbursed by direction of an act of Congress contrary to the provisions of the agreement that such fund would be held in trust at interest for fifty years. This court dismissed the claim on the ground that Congress possessed the authority to do what it had done without rendering the Government liable *681 for continued payment of interest under the prior agreement, and that the Indians had no legal claim against the Government for the interest on the trust fund which they, otherwise, would have received. See 307 U. S. 1.
In the case at bar the United States, acting through the Congress in the exercise of authority which it clearly possessed to legislate for what it deemed to be for the best interest of the Indians, did not “misappropriate” plaintiff’s land, nor did it “take” the land from the Indians and give it to another without compensation. The Government endeavored in every way possible during 1875 and 1876 to arrive at a mutual agreement with the Indians for the sale by the Indians of a portion of their reservation to the Government in conformity with article 12 of the treaty of 1868. The Indians refused • to sell. Thereupon the Congress, by the act of February 28, 1877, in effect, required the Indians to sell certain hunting rights and the Black Hills area of their reservation to the Government in return for a consideration of 900,000 acres of additional land and approximately one million dollars a year until such time as the Indians should become self-supporting, which consideration the Government, otherwise, was under no legal obligation to give. The exercise of this authority and the legality of it, insofar as the legal right of the Indians to question it is concerned, are, we think, no different in principle from the case where the Congress legislates for the cession, sale, or disposition of tribal property for benefit of the Indians in pursuance of a policy deemed to be in the interest of the Indians, as well as the Government, with- ■ out the consent of the Indians and in conflict with some provision of a treaty or agreement, or a prior law of Congress. The mere fact that the Government, in the case at bar, acquired the property outright, instead of in trust, for sale or disposition for the benefit of the Indians does not affect the legal principle which controls, and does not bring the claim for more money within the terms of the jurisdictional act.
Plaintiff’s position in substance is that one party to a proposed transaction cannot legally fix the terms or consideration and force the other party to accept them. This *682 is true in transactions between private parties dealing at arm’s length and on terms of equal authority, but this legal proposition does not follow in dealings between the Government and Indian Tribes so as to enable the Indians to question in a legal proceeding the policy, wisdom, or authority of Congress, unless Congress has clearly granted to the Indians the right to do so. In our opinion this has not been done for “the [jurisdictional] act grants a special privilege to the plaintiffs and is to be strictly construed and may' not by implication be extended to cases not plainly within its terms” — Klamath and Moadoc Tribes of Indians et al. v. United States, 296 U. S. 244, 250; Price v. United States, 174 U. S. 373, 375; United States v. Mille Lac Indians, 229 U. S. 498. To hold otherwise, it would be necessary for us to go back of the acts of August 15, 1876, and February 28,1877, and inquire into the policy as well as the judgment and wisdom of Congress which prompted it to act as it did and, therefore, adjudicate and render judgment either for or against the Indians on a moral claim. We cannot find that authority in the jurisdictional act. The provision in the first sentence of section 2 of the jurisdictional act that “any payment which may have been made upon any claim so submitted shall not be pleaded as an estoppel, but may be pleaded as an offset” is not a grant of jurisdiction (Klamath Tribe v. United States, supra), and therefore applies only to any payment which may have been made on any legal claim which comes within the scope of the terms of section 1 of the act.
The facts and circumstances of this case shoyr that in 1876 and in 1877 the Congress, being confronted with a situation where there was perhaps a moral obligation, but no legal liability, to provide subsistence for the Indians for a long time to come, and the Government not being in the position at that time to develop for the Indians any portion of their reservation so that the Indians might provide for their own subsistence, considered and decided that it was in the interest of all concerned that the Indians should give something to the Government which it wanted and needed in connection with the carrying out of a governmental policy in return for the expenditure for the benefit *683 of the Indians of large sums of public funds. It was then expending without obligation more than $1,000,000 a year. In these circumstances, and for the reasons hereinbefore stated, we are of opinion that plaintiff has no legal claim within the meaning of the jurisdictional act which is supported by any treaty, agreement, or law of Congress upon which this court is authorized to render a money judgment.
In reaching this conclusion we have kept in mind the principle of law that while the government always has the right to take or appropriate any private property for a public use, if it does so, without claim of title and without compensation, there arises an implied contract under the Fifth Amendment, and, therefore, a legal claim for just compensation. United States v. Buffalo Pitts Company, 234 U. S. 228, 234, 235. And we have also kept in mind the well-established principle that the ascertainment of just compensation for a taking or condemnation of property under the Fifth Amendment, or what constitutes just compensation thereunder,'is a judicial function and that “It does not rest with the public, taking the property, through Congress or the legislature, its representative, to say what compensation shall bo paid, or even what shall be the rule of compensation,” Monongahela Navigation Company v. United States, 148 U. S. 312, 324, 327; Seaboard Air Line Railway Company et al. v. United States, 261 U. S. 299, 304. In these cases Congress authorized the taking of property and authorized suit for recovery from the Government of just compensation therefor. But before this general rule is applicable to Indian cases, consideration must be given to the question of policy and the extent of the plenary authority of Congress to legislate in such a way as it deems proper with reference to the management and control of the property and affairs of the Indian tribes and the extent to which consent to be sued has been granted, as well as to the circumstances and conditions under which an implied contract will arise under the Fifth Amendment. ( The facts must show not only that there has been a “taking” or “misappropriation” by the Government of land or property of the tribe under such circumstances as will give rise to an *684 implication of a promise or undertaking to make “just compensation” (United States v. Creek Nation, 295 U. S. 103, 111), but that Congress has, by the jurisdictional act, which speaks only of legal claims, opened up the question of the fairness of what was done or of the adequacy of the consideration paid, and has authorized the court to determine, adjudicate, and render judgment accordingly. Klamath Indians v. United States, supra; Choctaw Nation v. United States, supra.
In the Monongahela Case, supra, Congress had authorized and directed the Secretary of War to negotiate for and purchase, if possible, certain properties of the Navigation Company and in the event of his inability to make a voluntary purchase of the lock and dam and its appurtenances for the sum authorized, the Secretary was authorized and directed to institute and carry to completion proceedings for the condemnation of the lock and dam and its appurtenances in the Circuit Court of the United States for the Western District of Pennsylvania, with the proviso that in estimating the sum to be paid by the United States, in such condemnation proceedings, the franchise of the corporation to collect tolls should not be considered or estimated. The court held that by this legislation Congress had “assumed the right to determine what shall be the measure of compensation. But this is a judicial and not a legislative question. The legislature may determine what private property is needed for public purposes — that is a question of a political and legislative character; but when the taking has been ordered, then the question of compensation is judicial.”
In the Seaboard Air Line Case, supra, Congress by section 10 of the Lever Act of May 23, 1919, authorized the President to take private property or other supplies necessary to the support and maintenance of the Army and Navy, or for any public use connected with common defense, and directed that the President “shall ascertain and pay a just compensation therefor. If the compensation so determined be not satisfactory to the person entitled to receive the same, such person shall be paid seventy-five per centum of the *685 amount- so determined by tbe President, and shall be entitled to sue the United States to recover such further sum, as, added to seventy-five per centum, will make up such amount as will be just compensation for such” property, and conferred jurisdiction upon the District Courts to hear and determine all such controversies. The question in that case was whether there should be added to the value of the property at the time it was taken an additional amount, measured by interest, in order to make the principal amount allowed just compensation contemporaneously with the taking.
The jurisdictional act confers no equitable jurisdiction such as would be applicable to the claim here presented. Compare Choctaw Nation v. United States, 119 U. S. 1, 2, 28, 29; Winton v. Amos, 255 U. S. 373, and Seminole Nation v. United States, 316 U. S. 286 (No. 348), decided May 11, 1942. While in a proper case the court may adjudicate a claim on equitable principles relating to fraudulent acts of those charged with the duty of administering the property and affairs of the Indians under treaties and acts of Congress — Seminole Nation v. United States, supra; Ross v. Stewart, 227 U. S. 530; United States v. Wildcat, 244 U. S. 111; Campbell v. Wadsworth, 248 U. S. 169 — no fraud is alleged in this case and there is no basis for such an allegation with respect to the action of Congress in August 1876 and February 1877. In the absence of a clear grant of authority by Congress, we have no jurisdiction to go behind the acts of Congress and inquire into any moral obligation of the Government or to determine whether what the Congress agreed to pay, and has paid, was adequate compensation for that which the Indians were required to surrender. Lone Wolf v. Hitchcock, supra. This phase of the claim clearly was not considered by Congress when the jurisdictional act was enacted and we cannot consider and adjudicate it unless and until Congress has unmistakably indicated its intention that we should do so. The report of the Committee on Indian Affairs of the House of Kepresent-atives (No. 77, 66th Cong., 1st sess.) shows very clearly, we think, that the extent and purpose of the jurisdictional act *686 was merely to provide a forum for the adjudication of legal claims. In this connection, the report states as follows:
Thus, notwithstanding the fact that the United States had by solemn treaty entered into in 1868 agreed to preserve inviolate the permanent reservation of the Sioux, in 1876 the above proviso in the Indian appropriation bill of that year plainly told the Indians that no more subsistence would be furnished them until they ceded a portion of their lands and certain rights of way over the remaining lands. Thus it is very easy to understand why the Indians consented to the agreement of September 26, 1876 (ratified Feb. 28, 1877), whereby they ceded the Black Hills country and gave consent to three road rights of way from the Missouri River to the Black Hills.
The Sioux Indians have for years urged their claim that the agreement of cession of 1876 was made under duress and carried no valuable consideration for the lands ceded; that the things which the Government agreed to do [in the acts of 1876 and 1877] it had already agreed to in the treaty of 1868.
Your committee, after carefully considering the matter, is of the opinion that to the end that the most amicable relations between the Government and the Sioux Indians should be promoted and that right and justice should be done, these Indian tribes should have the right to [have] their claims presented to and adjudicated by the Court of Claims.
What This Bill Provides
The salient features of the bill provide that all claims of the Indians, both legal and equitable, be submitted to the Court of Claims for adjudication, the Government having the right to set off as against any judgment which may be found any set-offs or counterclaims which the Government may have against the Indians,, including gratuities heretofore granted to them by Congress.
It further provides the .measure of damages and that the judgment of the Court of Claims for damages for misappropriating the lands of the Indians, if any be found, shall divest all claim and title of the Indians to the land upon satisfaction of the judgment.
*687 Section three proceeds on the theory that the proper measure of damages for the alleged wrongs is the value of the land at the time of the appropriation plus a reasonable interest charge as damages for detention of the amount owed from the date of the appropriation to date of decree. It appears that the Indians are not seeking a recovery of the land itself, but simply a sum as damages for their ouster and the appropriation of it by the Government. In this situation the cause of action or of complaint arose as soon as the ouster or dispossession or disseizing occurred. In short, the Indians chose and now choose to treat themselves as disseized, as having relinquished the land to the Government at the time of its appropriation, and their complaint, in substance, is that they have never received the money therefor. They were entitled to the money as soon as the disseizin occurred, and hence the thing due was this sum of money then due which, necessarily, was the then value of the land. Since they have been deprived of this money for these years, another element of damage necessary to make them whole would be the value of the use of the money to them had they received it at the time of the appropriation by the Government. This, of course, would be, to compute it in terms of money, a reasonable interest on this sum. The committee believes that 3 percent per annum is fair and equitable.
Section 8, last above mentioned by the House Committee, was not enacted. Section 3 of the bill as it had passed the House was eliminated by the Senate. The report of the committee of conference (House Report No. 1024, May 22, 1920, 66th Cong., 2d sess.) on the bill as it was finally enacted stated as follows:
The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H. R. 400) authorizing the Sioux Tribe of Indians to submit to the Court of Claims having met, after full and free conference have agreed to recommend and do recommend to their respective Houses as follows:
That the House recede from its disagreement to the amendment of the Senate, and agree .to the same with an amendment as follows:
After the word “funds,” in section 1, insert the words or lands, and before the comma in the same line insert *688 the words or hand or hands thereof; and the Senate agree to the same.
$ :!: * % ❖
This bill H. R. 400 authorizes the Sioux Tribe of Indians to submit claims to the Court of Claims. The Senate amended by substitution, which presented to'your managers three points of difference between the two bills and which are hereafter discussed in the order in which they appear.
In section 2 of the bill as passed by the House, in defining the jurisdiction of the Court of Claims and in providing what may be pleaded as a credit or set-off on the part of the United States, there appear the two words, “including gratuities.” The effect of these two words appears immaterial when it is noted that the fore part of section 2 provides “that if any claim or claims be submitted to said courts they shall settle the rights thereof, both legal and equitable, of each and all of the parties thereto * *
The fore part of section 3 as passed by the House provides that if it be found any lands have been wrongfully appropriated the damages shall be confined to the value of the land at the time of said appropriation. That was not carried in the Senate bill, inasmuch as the provision therein contained is the rule of all courts with relation to the misappropriation of land or other property. Hence it appears that this difference in the two bills is also immaterial.
The latter part of section 3 as passed by the House provided, if judgment should be recovered, interest should be decreed thereon at the rate of 3 per cent per annum from the date of the appropriation of the lands. It has not been the practice of Congress in passing Court of Claims bills to authorize the payment of interest, and the conferees finally agreed that it is perhaps not wise to establish a precedent along that line.
Inasmuch as section 3 of the House bill, which was not carried in the Senate bill, contains the only direct reference in the bill to a claim for damages on account of misappropriation of lands, the conferees agreed to an amendment in section 1 so that specific provision is made that the suit filed may be on account of the misappropriation of lands.
For the reasons stated, your managers receded from the disagreement to the Senate Amendment, and agreed to the same with the amendment referred to. As agreed to, the hill follows the usual form of authorizing suh- *689 mission of the claims of Indian tribes to the Court of Claims.
The agreement of the House to the conference report is, therefore, recommended. (Italics ours.)
The defendant contends that the claims for Class “B” and Class “C” lands.,, detailed in the amended petition filed May 7, 1934, are barred because not covered by the original petition. If plaintiff were entitled to recover, we think the amended petition is good under Paragraph VIII of the original petition and the second sentence of section 2 of the jurisdictional act.
The plaintiff tribe is not entitled, as a matter of law, to recover from the United States, and the petition must therefore be dismissed. It is so ordered.
Maddenj Judge; Jones, Judge; Whitakee, Judge; and Whaley, Chief Justice, concur.